## ZINN ET AL. *v.* BOARD OF ZONING APPEALS OF BALTIMORE COUNTY ET AL.

[No. 138, October Term, 1954.]

*Decided June 10, 1955.*

The cause was argued before BRUNE, C. J., and DELA-PLAINE, COLLINS, HENDERSON and HAMMOND, JJ.

*Nathan Patz,* with whom were *James C. L. Anderson* and *Frank H. Newell, III,* on the brief, for appellants.

*W. Lee Harrison,* with whom was *Michael Paul Smith* on the brief, for appellees.

HENDERSON, J., delivered the opinion of the Court.

This appeal is from a decision of the Circuit Court for Baltimore County affirming an order of the Board of Zoning Appeals. The case originated upon an application to the Zoning Commissioner by William T. Biermann and others, the owners of an 82 acre tract of land fronting on the north side of Smith Avenue between Greenspring Avenue and Pimlico Road, for the reclassification of about 55 acres of the tract from an "A" Residence zone to an "E" Commercial zone to permit the construction of a regional shopping center. The application was granted as prayed. On appeal, the Board of Zoning Appeals on May 14, 1953, granted the reclassification as to 5 acres, whose boundaries were not defined, and, although no application for a special permit was before it, also granted a special permit for an additional area of about 21 acres to provide off-street parking. Some of the protestants, by petition for *certiorari* which was granted, appealed to the Circuit Court, where additional protestants were allowed to intervene, as were the owners of the property. The present appeal, under Chapter 634, Acts of 1953, is by the protestants and the intervening protestants. The Board of Zoning Appeals filed no brief in this Court.

The appellants contend, primarily, that there was no proof of such a genuine change in the character of the neighborhood as would support the rezoning. They also contend that there was no justification for the grant of the parking permit. They further contend that the Board could not legally ignore the fact that another application was then pending for another shopping center to be located on the south side of Smith Avenue about 1,500 feet to the west, which was approved within two months of the approval in the instant case. They argue,

in the alternative, that the court should have reversed both orders, which were considered together on appeal, and should have remanded the cases with directions that the Board determine which, if either, of the two neighboring tracts should be rezoned.

The appellees contend that there was substantial evidence to support the findings of the Board in the instant case. While relying heavily upon a change in conditions, they also .assert that there was error in the original zoning. They contend that the grant of the parking privilege was merely incidental to the Board's power to modify the order of the Zoning Commissioner. They contend that the merits of the case involving another piece of property cannot be considered on this appeal.

Both sides agree that the law restated in the recent case of *Temmink v. Board of Zoning Appeals,* 205 Md. 489, is applicable. Judge Delaplaine, for the Court, there said: "It is an established rule that where an application is made for reclassification of a tract of land from one zone to another, there is a presumption that the zones established by the original zoning ordinance were well planned and arranged and were intended to be more or less permanent, subject to change only when there are genuine changes in conditions. Thus, before a zoning board rezones a property, there should be proof either that there was some mistake in the original zoning or that the character of the neighborhood had changed to such an extent that reclassification ought properly to be made. *Offutt v. Board of Zoning Appeals of Baltimore County,* 204 Md. 551, 105 A. 2d 219." In that case the order was reversed because a report of the Planning Commission, upon which the Board relied most heavily, was not put in evidence either before the Board or the court below.

It is true that there is no inherent objection to the creation of small districts within a residential zone, not inconsistent with a comprehensive plan, where establishments for the service and convenience of residents may be permitted. In some situations this may be a practical

necessity, due in part to the rigidity of the classification. The initial zoning plans were probably more concerned with holding the line in established communities than with the projected development of new ones, and the regulations were comprehensive only in the sense that some space was provided for the broad categories of land use and that the entire area was included in the terms of the ordinance. See *Reps, "The Zoning of Undeveloped Areas"*, 3 Syracuse L. Rev. 292, 294. But the presumption that the original zones were well planned and intended to be permanent still prevails, and the burden is upon the proponents of change to justify it by proof of original mistake or substantial change in the character of the neighborhood. Zoning, of course, looks to the future and is predicated upon an assumed ability to predict future needs within a narrow range of fallibility. When it is argued that an unanticipated need has developed, this presupposes a fault in the original plan, that should be ideally corrected by a resurvey of the land use map, rather than by piecemeal alteration. For a good discussion of the problem see *Borough of Cresskill v. Borough of Dumont,* 104 A. 2d 441 (N. J.). Cf. *Ward v. Scott,* 105 A. 2d. 851 (N. J.).

As noted in *Temmink v. Board of Zoning Appeal, supra,* the first zoning regulations adopted by the County Commissioners of Baltimore County were pursuant to Chapter 247, Acts of 1941, which authorized the adoption of a comprehensive plan, and Chapter 877, Acts of 1943, which authorized special exceptions. By Chapter 502, Acts of 1945, they were authorized to amend, supplement or repeal the regulations or restrictions adopted by them, after public hearing and upon recommendation of the Zoning Commissioner; "but with respect to the boundaries of zoning districts, divisions or zones the County Commissioners may impose on and vest in the Zoning Commissioner the power to amend, supplement or change, from time to time, the boundaries of such zoning districts, divisions or zones, provided that the Zoning Commissioner shall hold a public hearing or

hearings on any proposed amendment, supplement or change. No such amendment, supplement or change, however, shall become effective and binding until it shall have been approved in writing by the County Commissioners * * *" without further public notice. Code of P. L. L. of Baltimore County (1948), Title 23, sec. 366(c). Under sec. 366(d) the County Commissioners were authorized to vest in the Zoning Commissioner necessary powers for administration and enforcement, "including the power to make exceptions and to permit temporary uses in appropriate cases." Under sec. 366(e) appeal lies to the Board of Zoning Appeals "from any decision of the Zoning Commissioner". Under sec. 367, the additional authority is granted to the County Commissioners to provide in its Zoning Regulations that the Zoning Commissioner may "in appropriate cases and subject to appropriate principles, standards, rules, conditions and safeguards set forth in the Regulations, make special exceptions to the provisions of the Zoning Regulation(s) in harmony with their general purposes and intent, and in cases where the inherent character of the use requires that it be carried on in a district or area to which it does not conform, or where the use has a peculiar tendency to impair the health, safety and morals of the public, the County Commissioners shall, in its Zoning Regulations, require a special permit from the Zoning Commissioner for such use, provided * * * all decisions of the Zoning Commissioner with respect to such special permits, shall be subject to appeal to the Board of Zoning Appeals."

The meaning of these provisions is not entirely clear, although it was assumed in *Temmink v. Board of Zoning Appeals, supra,* and *Offutt v. Board of Zoning Appeals of Baltimore County, supra,* that a delegation of power to alter boundaries could properly include a power to reclassify any property within a zoning district. We are not here concerned with the various amendments in the Regulations and classifications adopted on March 30, 1955, by the County Commissioners. The appeal

here was predicated upon a reclassification by the Zoning Commissioner.

The Baltimore County Planning Commission was created by resolution of the County Commissioners by authority of Code (1951), Article 66B, Section 11. Among its general powers and duties, set forth in Section 15, was the adoption of a master plan for the physical development of the municipality, "as well as a zoning plan for the control of the height, area, bulk, location, and use of buildings and premises." It was authorized to "from time to time amend, extend, or add to the plan". It is difficult to determine at what point the authority of the Planning Commission ends and the authority of the Zoning Commissioner begins. Final approval in any case rests with the County Commissioners. We may note that the Planning Commission was reconstituted by Section 478, Chapter 610, Acts of 1955, effective June 1, 1955. Existing rules and subdivision regulations were validated by that Act.

It is conceded in the instant case that the whole neighborhood in question was originally zoned residential in 1945 and has retained that classification; that the present owners acquired the tract about three months before they filed their application in December, 1952. The only commercial uses anywhere in the vicinity are a few isolated nonconforming uses that ante-dated 1945, such as "The Summit" Restaurant and Night Club, a small ice cream stand, a drive-in ice cream store and an old stone quarry. There is also the property involved in the other case mentioned, which is used as a radar school by the Bendix Radio, in the old Curtis-Wright Airport hangar buildings. This is claimed to be a nonconforming use, but we need not here consider its legal status. There is also an anti-aircraft station on nearby property rented by the Federal Government on short-term lease. Both these uses are supposed to be temporary and connected with the national defense program. It is conceded that, since 1945, many residences have been built in the area, referred to by the Board as "a phenomenal growth in

this section". There are, however, still some large open areas undeveloped at this time. The Board did not find that the existing nonresidential uses constituted a change in the character of the neighborhood. Its comment was simply that "these miscellaneous non-residential uses do not adequately provide for commercial needs in this area".

There was no evidence that the tract in question was not entirely suitable for residential development, nor was there any convincing testimony of a need, in the sense of inaccessibility to other shopping centers or stores within a reasonable distance, as in *Wakefield v. Kraft*, 202 Md. 136. The abundant testimony in opposition from the protestants would indicate that they, at least, felt no need. On the contrary, it was their testimony that they had moved from the city in search of relief from distractions, and relative freedom from traffic hazards and congestion. It is significant that two of the owners testified that there had been no change of any consequence in the neighborhood since the Zoning Ordinance was adopted. Their plan contemplated that they would draw on customers within a radius of at least four miles. Among the business establishments contemplated were furniture, food, delicatessen and other stores, a theatre, restaurant and two filling stations. There are a large number of shopping centers and similar facilities within a mile or so from the proposed location.

The appellants argue that there is nothing in the record to show that there was any error in the original classification of the property as residential, and that time has only served to verify its correctness, because the only change has been in an intensification of the residential use and a large increase in the market value of land held for residential development. Presumably, it is worth still more for commercial development. Malcolm H. Dill, Director of the Baltimore County Planning Commission since 1947, testified that there was no definitive land use plan in the original zoning, "it was zoned

residential by default". He testified the property in question "could be used for residential purposes", or "could be used for the purpose for which it is proposed. * * * I think I could properly say the logical place for a shopping center whether neighborhood, community, or regional is the intersection of relatively important streets." He admitted that Smith Avenue was only twenty-one feet wide at present, but thought it might eventually be widened. A proposal to widen Greenspring Avenue is in the planning stage, to tie in with the proposed "beltway" about a mile to the north. In regard to the original classification, he said: "The need for many of these facilities, community facilities, becomes evident as the growth of population in the development takes place and certainly would have been less obvious at that time. * * * without a plan you could not tell where you needed a shopping center. * * * I wouldn't attempt to say it is the only possible location but it appears to be a logical location from certain standpoints."

The Board found that the existing highways were inadequate to handle the traffic that might be drawn to a regional shopping center, but that a smaller center would not be detrimental to the neighborhood. Implicit in the opinion was the thought that the intensification of the residential use in itself furnished a justification for rezoning to provide shopping facilities, and that such provision is a virtual necessity in a growing residential community. The Board was evidently impressed with the statements of the owners that if the shopping use were ever abandoned, they would agree that the property be rezoned as residential, although the appellants contend with some force that the owners would be entitled to devote it to commercial uses of a varied character.

We need not decide whether a mere intensification of residential use could support a reclassification, upon a stronger showing of need than the record discloses. The fundamental objection lies in the fact that there is apparently not now in existence, any more than there was in 1945, a truly comprehensive land use plan. In the

absence of such a plan, the Board is put in the position of making piecemeal adjudications on testimony produced by successive applicants and protestants, in which one proposed exception follows another, without any opportunity to consider objectively the long-range purposes. The dangers in this type of procedure have been noted. Cf. *City of Baltimore v. Byrd*, 191 Md. 632, 637 and *Bartram v. Zoning Commission*, 68 A. 2d 308, 312 (Conn.). See also *American Oil Co. v. Miller*, 204 Md. 32 and *Cassel v. City of Baltimore*, 195 Md. 348. Without discussing the facts in the other zoning case referred to by the appellants, it furnishes an illustration of the dangers, for it is a conceded fact that the Board has rezoned two tracts within a stone's throw of each other, to permit the establishment of two large shopping centers. Whatever the merits of each application considered separately we think there can be no justfication for both. It is this kind of piecemeal zoning that brings the whole process under criticism.

On this record we cannot find such a showing of original mistake or subsequent change in the residential character of the neighborhood as would support a rezoning such as was approved in *Offutt v. Board of Zoning Appeals of Baltimore County, supra.* Nor do we find, in the special circumstances here presented, a justification for the rezoning. Not only do we find a lack of substantial evidence to support the Board's action approving the change, but in this limited record it is impossible for us to say wth any assurance, as it was for the Board, that other sites are not available that might better serve the public interest from the point of view of accessibility to important roads, compatability with projected plans, and the like. For the solution of problems like these it would seem that the County Commissioners should bear the chief responsibility, through the utilization of a Planning Commission setup to deal with the overall picture in a more objective way. We understand that such a study is in progress. In the meantime, reclassifications or special exceptions should not be granted

except where there is a clearer showing of original mistake or subsequent change than appears from this record. We find it unnecessary to discuss the other points argued. Under Chapter 634, Acts of 1953, we must direct that the costs be paid by the appellants.

*Order reversed, the costs to be paid by the appellants.*