TRUSTEES OF McDONOGH EDUCATIONAL FUND AND INSTITUTE, Etc., et al. *v.* BALTIMORE COUNTY, MARYLAND et al.

[No. 106, September Term, 1959.]

552

554

*Decided March 14, 1960.*

The cause was argued before Brune, C. J., and Henderson, Hammond, Prescott and Horney, JJ.

*John Grason Turnbull, J. Nicholas Shriver* and *John W.*

*Cable, III,* with whom were *Robert M. Thomas, Turnbull & Brewster, Cross & Shriver, Cable & McDaniel* and *Venable, Baetjer & Howard* on the brief, for the appellants.

*Walter R. Haile, Deputy County Solicitor,* with whom was *Johnson Bowie, County Solicitor,* on the brief, for Baltimore County, Maryland, one of the appellees.

*W. Lee Harrison,* with whom was *Richard C. Murray* on the brief, for the McDonogh Construction Company, the other appellee.

PRESCOTT, J., delivered the opinion of the Court.

The plaintiffs below appeal from a decree that dismissed their bill of complaint, which alleged that the action of the appellee, Baltimore County, Maryland, [at the time of the action complained of the former county commissioners constituted the county council until the newly elected members of the county council took office, Section 1106 of the Charter of Baltimore County] in classifying property owned by the other appellee, McDonogh Construction Company (Construction Company), under a new comprehensive zoning map for the Third Election District of Baltimore County, was arbitrary and illegal; and sought to have said zoning classification declared invalid and to enjoin the use of the property for the purposes permitted by a B-M Business, Major or an R-20 Residential classification.

Although the issues are few and their scope rather narrow, the record extract is quite voluminous, consisting of some 1,067 pages of testimony. It will, therefore, be necessary to summarize the same considerably in order to keep this opinion within reasonable bounds.

Since 1950, the Construction Company has been the owner of an 83-acre tract of land, lying at the northwest corner formed by the intersection of McDonogh and Reisterstown Roads in the said third election district. With the adoption of the first zoning maps for Baltimore County on January 2, 1945, a portion of the property in question (approximately 150 feet on Reisterstown Road) was zoned "E" commercial,

the only commercial classification which existed under those regulations, and the balance was zoned "A" Cottage Residential. The latter residential zone was the only zone under the original zoning regulations which was limited to cottage or detached house construction, and in that zone no lot could be less than 5,000 square feet in area.

On March 30, 1955, the County Commissioners of Baltimore County repealed the regulations which had been in effect since January 2, 1945, and enacted a completely new set of regulations which established new zoning classifications and further provided that new comprehensive zoning maps would be adopted for each of the Election Districts of Baltimore County. The new regulations also provided that during the interim, the then existing zoning maps would continue to be the official zoning maps for the county until such time as the new maps were adopted. In addition, the new regulations provided that all land which was shown as "E" Commercial on the then existing maps would automatically go into the "B-L," Business, Local zone, which was one of three commercial zones provided for by the new regulations, and which was the most restricted of the three commercial zones so adopted. The new regulations further provided that all land which was zoned on existing zoning maps as "A" Residential would automatically become R-6 (residential lots of not less than 6,000 square feet area), pending the adoption of a new comprehensive zoning map for the particular district in which the land was located.

The four corners of the intersection of Reisterstown and McDonogh Roads (comprising about 4½ acres according to Respondents' Exhibit I) had been zoned "E" Commercial (Craddock's Lane being more or less of an extension of McDonogh Road running in an easterly direction from the Reisterstown Road), when the original zoning map for the area was adopted in 1945. However, a restaurant and cocktail lounge known as the Ten Mile House, located on the west side of Reisterstown Road and completely surrounded by the subject property, remained as a nonconforming use, as it had been in existence for many years prior to the adoption of zoning in Baltimore County. The same situation existed with

respect to an old stone building located on the east side of Reisterstown Road, directly opposite the Ten Mile House which had been used over the years as an antique shop. Of the four corners of the intersection, the northwest corner (on the subject property) was the only one which had been used commercially, being occupied by a roadside fruit and produce market.

The subject property lies roughly one-half of the distance between Naylor's Lane in Pikesville and Painter's Mill Road —the boundary between the third and fourth election districts—which covers about three and one-half miles. On the west side of Reisterstown Road between these points, there is 3,150 feet of R-10 zoning (10,000 sq. ft. per residence, with exceptions) ; 800 feet of R-20 zoning (20,000 sq. ft. per residence, with exceptions) ; 3,400 feet of R-40 zoning (40,000 sq. ft. per residence), 800 feet of which is the Woodholme Golf Course; 2,500 feet of B-L zoning (Business, Local) ; 2,900 feet of B-M zoning (Business, Major), which is the subject property; and 4,300 feet of M-R zoning (Manufacturing, Restricted). Thus, it is seen that about 57% of the frontage on the west side is zoned for business and manufacturing purposes, and some 23% is zoned for the same or higher density than permitted in R-20 Residential classification. On the east side of Reisterstown Road, about 60% of the frontage is zoned for business or residential uses of a higher density than that permitted in R-40 classification.

In the ten years between 1930 and 1940, the population of the third district had remained static, showing an increase of only 741 persons. In the ten-year span between 1940 and 1950, the population increase of the entire district was only 3,922 persons. However, *in the seven-year period between 1950 and 1957 the population of this district more than doubled,* showing an increase of 11,671 persons or at the rate of 105.4%, which was the second highest percentage of increase for any district in Baltimore County for that period. The highest percentage of increase was in the second district, 117.4%, the boundary of this district being ½ mile from the subject property and this district being part of the primary trade area of the proposed shopping center. The years be-

tween 1945 and January, 1957, saw eleven tracts of land reclassified to manufacturing uses, four tracts reclassified for apartments, one tract reclassified for group homes, special exceptions granted on 19 tracts and 22 tracts reclassified for commercial uses—all by reclassifications on the Third District Map.

On April 18, 1956, the Baltimore County Planning Board delivered a master plan or land use plan to the zoning commissioner for his use in preparing and recommending to the Board of County Commissioners a comprehensive zoning map for the third election district. This master plan or land use plan contained information as to existing and planned parks, existing and planned highways and roads, existing and planned schools, and recommended zoning or land uses for the area.

At the time the master plan was transmitted to the zoning commissioner, a large acetate overlay, which covered the entire map or plan, had contained on the area covering the Suburban Club property (located on the east side of Reisterstown Road, approximately two miles south of the subject property in Pikesville) a symbol which indicated that the Suburban Club property was "to be reserved for a major business zone." On May 8, 1956, prior to the hearing before the zoning commissioner on July 16, 1956, the Office of Planning transmitted a recommendation that approximately fifty acres of the Suburban Club site be added to the zoning map as Business, Local for use as a major or regional shopping center. This was accomplished by means of a letter of transmittal and a small acetate overlay, which delineated the boundaries of the business zone on the Suburban Club property.

After receipt of the zoning recommendations of the planning board, which recommended that the subject property be zoned R-40, the zoning commissioner conducted an investigation and duly advertised a public hearing on the recommended map for July 16, 1956.

At the hearing of July 16, 1956, the zoning commissioner announced that he would receive written petitions setting forth the proposals or objections of anyone interested in any particular property shown on the third district map within ten

days following the hearing. Prior to this time, it was proposed that the subject property be zoned R-40 in its entirety, completely eliminating the pre-existing commercially zoned and used property at the corner. There was testimony to the effect that R-40 zone was considered to be a reservoir zone out of which might come various uses of properties. On July 16, 1956, the Construction Company submitted a petition to the zoning commissioner requesting that its property be zoned for a major shopping center and the construction of cottages on R-10 (10,000 sq. ft.) lots.

After the zoning commissioner's hearing of July 16, 1956, and prior to the submission of his final report to the county council on November 21, 1956, the zoning commissioner learned that the membership of the Suburban Club, most of whom were nearby residents opposed to the zoning, refused to agree to a sale of the club property for use as a shopping center, even if so zoned. When the zoning commissioner learned that this property was unavailable as a possible future business site, he testified that he made a survey of the entire third district and checked with the Department of Public Works in regard to the subject property. He finally decided to recommend to the county council that the Construction Company's property be classified as B-M and R-20, because, in his opinion, the business classification "would be less objectionable [there] than any other place"—it was practically undeveloped as the "development hadn't moved out that far."

The zoning commissioner accordingly sent his report and proposed new comprehensive plat for the third election district to the county council, which, after public notice and public hearing thereon, adopted the same with the Construction Company's property classified as indicated above. Whereupon, the appellants instituted suit, claiming that the action of the council was arbitrary, capricious, discriminatory and illegal.

The principal contentions of the appellants are that the action of the legislative body in classifying 42 acres of the Construction Company's property as B-M and the 41 acre tract as R-20 (we shall subsequently see that in reality there were only 32 acres zoned R-20) on the new comprehensive map

for the third election district was arbitrary and capricious; that these classifications constituted illegal spot zoning; and that the requirements of Section 532(a) of the 1955 Code for Baltimore County relating to the reduction of "congestion in the roads, streets and alleys" were not complied with. They acknowledge that whether the adoption of a new land use map constitutes zoning or rezoning, a heavy burden of overcoming the strong presumption of validity of the legislative action in making the classification rests upon those attacking it; but argue (before our decision in *McBee v. Baltimore County,* 221 Md. 312, 157 A. 2d 258) that the action of Baltimore County in adopting new comprehensive land use maps for the several districts of Baltimore County constitutes *rezoning* rather than zoning, and, if this be so, then the proponents of the rezoning must, in order to sustain the rezoning, overcome the presumption of correctness in the original zoning by showing either a change in the neighborhood or a mistake in the original zoning.[1]

In *Hewitt v. Baltimore County,* 220 Md. 48, 57, 151 A. 2d 144 [a case which involved the new comprehensive map for the eighth district], we stated:

> "In *Huff v. Board of Zoning Appeals, supra,* 214 Md. at p. 52, we said that '[t]he County Commissioners determined in 1954 [Ordinance passed in 1955] to rezone the whole of Baltimore County.' In *Fuller v. County Commissioners, supra,* [204 Md. 168] we did not draw a distinction between zoning and rezoning. In the present case, although the action of the County Commissioners would appear to be (as stated in the *Huff* case) rezoning, rather than zoning, we think that the same result would be reached in either aspect of the case."

In *St. Mark's, Etc., Church v. Doub,* 219 Md. 387, 397, 149 A. 2d 779, we assumed, without deciding, that the "change or

---

1. They here cite American Oil Co. v. Miller, 204 Md. 32, 102 A. 2d 727; Zang & Sons, Builders, Inc. v. Taylor, 203 Md. 628, 102 A. 2d 723; and Zinn v. Board of Zoning Appeals, 207 Md. 355, 114 A. 2d 614.

mistake" rule applied to comprehensive rezoning. However, in the *McBee* case, *supra,* [a case involving the ninth district] the questions of the presumption accorded a new comprehensive zoning and the applicability of the "change or mistake" rule to such zoning were flatly answered. We held that Baltimore County, in legislating a new zoning for the whole county, was exercising a plenary power delegated by the General Assembly; and when a new comprehensive plan or map, designed to cover a substantial area, was adopted, it was entitled to the same presumption of correctness as an original zoning, and the so-called "change or mistake" rule applicable to piecemeal rezoning cases was not controlling.

The appellants seem to concede that the map here involved is "comprehensive." Indeed, it seems they must. There can be little doubt that it covers a substantial area; that it was given careful consideration and adopted after a long and extensive study; and that it was designed to control and direct the use of land and buildings according to present and planned future conditions, so as to accomplish, as far as possible, the most appropriate uses of land consistent with the public interest and the safeguarding of the interests of the individual property owners. *Huff v. Board of Zoning Appeals, supra,* 214 Md. 48, 59, 133 A. 2d 83. Cf. *Hewitt v. Baltimore County, supra; McBee v. Baltimore County, supra;* 8 McQuillin, *Municipal Corporations* (3rd Ed. Rev.), Section 25.79.

We must, therefore, examine the classifications of the 42 acre parcel and the 41 acre tract with their presumptions of validity, and see if the appellants have clearly made out a case of invalid spot zoning relative to either parcel, or that the council was arbitrary or capricious in making the classifications, subjects which, to a certain extent, intertwine. They argue that the subject property and the properties of the appellants lie in what they term a "greenbelt" ranging from one to four miles in width, extending from Randallstown to Towson; that the Baltimore County planning authorities recommended that the subject property be zoned R-40; that the shopping needs of the residents are and will continue to be adequately served by the present facilities; that the population

of the third district is not now, nor will it be in the future, sufficient to support a regional shopping center; that all of the area surrounding the subject property is zoned R-40; that the zoning complained of will permit a breakdown of the area to an ultimate density of population in excess of the sewer capacity of the Master Plan for the area; and that the amount of commercial zoning provided for between McDonogh Road and Reisterstown was far in excess of any need for commercial development which could ever occur in the area. They, of course, offered evidence in an attempt to sustain these arguments.

However, as we have indicated above, the record discloses that a large percentage of the land fronting on Reisterstown Road in the area is zoned for business uses or uses of a higher population density than R-40. The business district of Garrison is close by to the north. The large acreage owned by the appellant, Trustees of McDonogh Educational Fund and Institute, etc., in the main part, is situated some three-quarters of a mile to the west of the subject property in another election district, which has not as yet had its new comprehensive plan adopted. This means the property is at present zoned R-6.

It is true that the planning board (or its staff) originally recommended a low density classification for the subject property. However, upon further deliberation after being confronted with the unavailability of the Suburban Club property, the board saw "merit in the future possibility of a major commercial development in this area (the vicinity of Reisterstown and McDonogh Roads)," and made certain recommendations to the county council if such a commercial development were authorized. The recommendations of the planning board and its reasons therefor are, of course, entitled to be weighed and considered in determining the question of whether the action of the county council was arbitrary or capricious; but its suggestions to the zoning commissioner amounted to no more than recommendations to him, *Fuller v. County Comm.*, 214 Md. 168, 171, 133 A. 2d 397, and his final report to the county council, in turn, constituted his recommendations to them for their approval or disapproval. *St.*

*Mark's, Etc., Church v. Doub, supra,* 219 Md. at p. 392; *Fuller v. County Comm., supra.* It was the responsibility of the county council to make the final determination as to the manner in which the boundaries, districts, etc., should be established.

We turn now to the claim that the population of the third district is not now, nor will it be in the future, sufficient to support a regional shopping center. In the comprehensive zoning of an entire county, when it is done, as here, by successive comprehensive maps of different districts, each district is not considered as an individual and independent entity in regard to its needs and what its population, alone, will support; the zoning authorities are at liberty, and it is their duty, to consider the overall situation of the surrounding areas. There was testimony to the effect that the subject property was located geographically in about the center of the second, third and fourth districts whose combined populations in 1957 constituted about 57,000 people; that a population of some 60,000 people, within a ten-minute driving radius, was necessary to support a major shopping center; that the population of these districts by 1964 should be 85,000 persons, and by 1967 probably would increase to 97,000 people; that possibly this population would be within the ten-minute driving radius; that in an area approximately ten miles square, in which the subject property was located, there was not a single supermarket; and that "this neighborhood, in the next ten years, is going to yield a tremendous or very large expansion of population," and the subject property is "an excellent location for a regional shopping center" because of accessibility, population, purchasing power and quality.

As of January 16, 1957, there already existed a sixteen inch water main in the Reisterstown Road, immediately adjacent to the property of the McDonogh Construction Company, and the Gwynns Falls Interceptor (sanitary sewer) had been extended as far as Mt. Wilson, which was approximately a mile down the ravine from the subject property and easily accessible. Plans were in existence to increase the water main to 36 inches. The property of the Construction Company could be sewered, as of January 16, 1957, by extending a sub-inter-

ceptor from Mt. Wilson to the subject property. Moreover, as of January 16, 1957, Baltimore County was under a definite commitment to the State Department of Health to extend the Gwynns Falls Interceptor to Reisterstown. In addition, the extension of the sewer line to Reisterstown was included in the county's six-year capital improvement program as of that date and contracts were let for its construction on March 18, 1957. The sewer line interceptor was designed to take care of between 45,000 and 50,000 people which was calculated to be the ultimate population between Mt. Wilson and Reisterstown, Mt. Wilson being about one mile south of subject property and Reisterstown being about eight miles to the north. There was also testimony that, in regard to the subject property, there would be no impact on the sewage system because of different peaks and the overall effect on water and sewer would be infinitesimal at this location.

The claim that the commercial zoning provided between McDonogh Lane and Reisterstown to the north is in excess of the need that will ever occur seems to be based upon the report of the planning board. This report states that between the points mentioned above there is commercial zoning that would permit (including the subject property) four regional type shopping centers, and, while it is conceivable that one such regional facility might be needed in the area, it was felt that four would be excessive. Of course, we are only determining an appeal that involves the subject property. We do not have the details concerning the other properties mentioned, nor the reasons that actuated the legislative action in classifying these other properties. We do know that the subject property was the first of the four to be zoned B-M. If a regional shopping facility was needed and the property here involved was zoned to accommodate that need, the appellants have not shown any such relationship between the above subsequent legislative actions and that here under attack as to indicate that the first of these rezoning actions (that here involved) was arbitrary or capricious when taken.

From what we have said above, we are unable, up to this point (the question of congestion of traffic will be considered below), to say that the appellants have clearly shown arbi-

trary, capricious or illegal conduct on the part of the county council. Pursuant to their resolution of 1955, the council had the planning board and its staff study and consider, among other things, the character of the area involved, its needs and peculiar suitability for particular purposes, according to present and foreseeable future conditions, with a view of accomplishing, so far as possible, the most appropriate uses of the land consistent with the public interest and the safeguarding of the interests of individual property owners. The planning board made its recommendations to the zoning commissioner, and he, in accordance with law, made his recommendations to the council. At the time of his recommendations, he testified that he had concluded there was a public need in the area for a regional shopping facility, and, when confronted with the unavailability of the Suburban Club property, he made a survey of the entire election district and selected the subject property because of its accessibility and due to the fact that it was in an undeveloped area, and he thought it would be less objectionable there than at any other place. The council, after receiving his report and giving public notice, held a public hearing on the new comprehensive map. Some of the appellants appeared at this hearing and protested the classifications of the subject property, but the council thereafter adopted the recommendation of the zoning commissioner. We have repeatedly said that, when reviewing the action of a legislative body relating to zoning matters, our function to review is restricted and narrow in scope, and the legislative exercise of the police power, with its strong presumption of validity, will only be struck down upon a clear and affirmative showing that it was arbitrary, capricious, discriminatory or illegal. *Fuller v. County Comm., supra,* 214 Md. at p. 173. After considering the evidence as outlined above, we reach the conclusion that the appellants have failed to establish arbitrary or capricious conduct by the county council. More will be said concerning the 41 acre parcel, zoned R-20, below.

This brings us to a consideration of the question of spot zoning. We shall not define the term as we have done so in at least two recent cases: *Hewitt v. Baltimore County, supra,* 220 Md. at p. 58; and *Huff v. Board of Zoning Ap-*

*peals, supra,* 214 Md. at p. 57. When a small area is classified arbitrarily and unreasonably so as to permit a use that is inconsistent with the uses to which the rest of the district is restricted and made for the sole benefit of the private interests of the owner, such a classification is illegal spot zoning. We cannot say upon the record before us that the subject property was arbitrarily selected to permit uses inconsistent with the uses permitted in the remainder of the district or that it was classified for the primary benefit of the owner. The council was confronted with the adoption of a new comprehensive plat, and, looking to the foreseeable future, the public need for a regional shopping center and some residential area of a medium residential density as a buffer zone to the commercial zoning. After deliberation, they selected the appellee's property, which was geographically located near the center of a population that would support such an undertaking. The property is located upon a main highway in close proximity to other commercial enterprises, and, insofar as the record discloses, is in an available location that is, at least, as unobjectionable as any in the immediate area.

The contention that the subject properties are surrounded by properties zoned R-40 is not supported by the record. The record discloses that the council selected a point some 1,700 feet west of the Reisterstown Road on the McDonogh Road and ran a straight line northerly, roughly paralleling the Reisterstown Road, until it reached an area zoned R-10, which apparently is a buffer to business classifications on, and some slightly to the north of, Tobins Lane. With the exception of the 42-acre parcel belonging to the appellee zoned B-M, which fronts upon Reisterstown Road with a depth of 850 feet, the property used as the Ten Mile House, and a small area to the north of the 42-acre parcel, also zoned B-M (and belonging to one of the complainants), all of the property between Reisterstown Road and the line drawn in a northerly direction, mentioned above, is zoned R-20. This area includes 32 acres of the 41-acre parcel belonging to the appellee (the remainder of this parcel being zoned R-40), which lies immediately to the west of appellee's 42-acre parcel, properties that belong to three of the appellants (who do not

request a striking down of their classifications), and a parcel of some 53 acres, whose owner is not disclosed in the record. There is nothing unusual in zoning—it perhaps could be said it is customary—to establish a residential area of higher density between residential areas of low density and business classifications to act as a buffer zone. An examination of a composite plat, which pictures the situation more clearly than the description given above, discloses what appears to be a logical buffer zone of R-20 classification between the business zone to the east and the R-40 classification to the west. We cannot say that this R-20 classification was arbitrary or capricious, or that it constituted illegal spot zoning. It may be worthy of mention to say that if this R-20 classification of the appellee's property, alone, were changed to R-40 it would create the incongruous situation of an R-40 area fanning out into R-20 and B-M zones, with the R-20 area to its north irregular in shape with a meandering perimeter.

The instant case is quite different from that of *Hewitt v. Baltimore County, supra,* which the appellants contend should be controlling here. There, protestants attacked a commercial classification for property carved out of an otherwise exclusively residential area. The subject properties, as well as all of the parcels of land owned by the protestants, had been zoned for residential use since the original zoning of Baltimore County in 1945. The planning board, after an extensive study of the proper land uses to be recommended on the new comprehensive map of the eighth election district, submitted the map or plan to the zoning commissioner. On this map, an entire area of fifteen to twenty square miles west of the Baltimore-Harrisburg Expressway was recommended for residential zoning. There was testimony that the planning commission [or board] could see no apparent reason for commercial zoning west of the expressway in view of the expected low density development in that extensive area, while substantial areas east of the expressway were designated for commercial and industrial uses. The zoning commissioner, after public hearing, submitted his final report to the commissioners [now the county council] in which he concurred in the conclusion that all land west of the expressway should be

retained in residential categories. At the public hearing of the county commissioners, which is required by law, it was suggested for the first time, by the property owners, that the subject properties, comprising some 19 acres, be classified for non-residential uses. No evidence was offered at the hearing in support of the requests of the property owners, nor was any objection expressed by any of those present. Thereafter, the commissioners approved a new map for a portion of the eighth district under which the subject properties were carved out of the otherwise exclusively residential area west of the expressway and classified Business, Local. No reason was assigned for making this exception to the residential zoning west of the expressway other than meeting the possible needs of transients. We held that the expressway formed a substantial physical barrier between the property lying to the east of it and that lying to its west; that it was the logical line of demarcation between business and residential uses; that the evidence showed that there was ample area east of the expressway and close to it, which was so zoned as to be able to satisfy all probable needs of transients; and that it was "patent that any commercial use of land west of the expressway in this vicinity would involve a departure from a comprehensive plan."

The appellants next contend that the action of the commissioners [council] in "the adoption of the zoning complained of" failed to comply with the provision of Code Baltimore County (1955), Section 532 (a) which requires zoning regulations to be "designed to reduce congestion in the roads, streets and alleys." Fully supported by the evidence, the Chancellor said concerning the existing and planned roadways:

> "The major existing north-south roadway passing through the 3rd District is the Reisterstown Road, a four lane highway leading roughly from the northwest corner of Baltimore City to Reisterstown. Other existing major north-south highways are Falls Road, which forms part of the east boundary of the 3rd District, and Liberty Road, which lies within District No. 2 on the west. Excluding minor road

networks that would involve somewhat circuitous travel, there are only two reasonably direct methods by which east-west traffic may pass through the Third District from the Falls Road on the east to the Liberty Road on the west, i.e. (1) via Old Court Road, or (2) via Green Spring Valley Road, Craddock Lane, McDonogh Road. Of these two east-west arteries (1) makes junction with Reisterstown Road at the northern edge of Pikesville, but its use for east-west passage requires vehicular traffic to pass upon and travel on Reisterstown Road for a short distance in order to complete travel from east to west, or vice versa. The latter route, (2) while not crossing Reisterstown Road at the usual 90 degree angle crossing, does permit movement of east-west vehicular traffic across Reisterstown Road pursuant to a traffic control signal without making it necessary for such vehicles to travel north or south on Reisterstown Road in the course of their travel. Both east-west route (1) and (2) are two lane, two way highways.

"At the time of the passage of the subject ordinance plans existed for a high speed east-west artery (Baltimore Beltway) that will connect Falls Road on the east and Liberty Road on the west, and will pass through the 3rd District north of Pikesville and south of the subject tract. The Baltimore Beltway will have ramp interchanges at Reisterstown Road, and at the time of the passage of the ordinance had reached the stage of development wherein part (but outside of the 3rd District) has been completed.

"Also planned as a future facility is a high speed north-south highway to be known as the Northwest Expressway, leading from a point somewhere near Park Circle, in Baltimore City, to a point just south of Reisterstown. The planning for this facility indicates it will be constructed near the line of the westernmost boundary of District No. 3, but its precise location as of the time of trial was tentative and

somewhat uncertain. Sometime prior to the adoption of the subject ordinance the State Roads Commission had furnished the Planning Department with information to the general effect that the proposed Northwest Expressway would have an interchange with McDonogh Road at a point near the Western Maryland Railroad and near the west border of District No. 3. This interchange was also in the tentative stage. There was testimony that it was planned to widen McDonogh Road to a four lane highway."

The appellants offered Mr. Sexton, a traffic engineer, as an expert witness. He testified in chief that the proposed shopping center was not properly located from a traffic engineer's viewpoint, giving as his reason therefor that a shopping facility of the proposed size should be located so as to have access on two roads that would approximate the present size of Reisterstown Road. If McDonogh Road were a four-lane arterial highway, then the shopping center could be located on the subject property from a traffic standpoint. Upon cross-examination, he admitted that his opinion that a shopping facility could not properly be located on the appellee's property was based exclusively upon the roadways *in existence* as of January, 1957. He finally stated in answer to a question propounded to him: "Provided that McDonogh Road and Valley Road were improved to a four-lane major arterial highway, it [the subject property] would be a fine place [for the shopping center]." The appellee offered expert testimony to the effect that the existing and proposed roadways were sufficient to accommodate any traffic increase engendered by the new classifications.

Of course, the county council was not confined in its deliberations upon the recommended new comprehensive plan exclusively to the roadways then in existence. If this were so, it would destroy many of the advantages of zoning. A comprehensive plan, as we have stated above, is specifically designed "to control and direct the use of land and buildings according to present and *planned future* conditions." We think the council was entitled to consider any proposed new highways, or proposed improvements to existing highways,

that were reasonably probable of fruition in the foreseeable future in determining the proper classifications for the subject property. *Missouri Realty, Inc. v. Ramer,* 216 Md. 442, 450, 451, 140 A. 2d 655. In *St. Mark's, Etc., Church v. Doub, supra,* 219 Md. beginning at p. 394, we dealt with the meaning of "congestion in streets" as used in the statute, and pointed out that it is only one of six general objectives of the "statutory design." On the record before us, the appellants have not, we think, shown arbitrary, capricious or illegal action by the council in relation to traffic congestion.

As a subsidiary contention to the question of traffic congestion, the appellants assign as error the chancellor's refusal to admit certain of their testimony. They proffered to prove that since January 17, 1957, the date of the adoption of the new map, the tentative plan for an interchange of McDonogh Road with the Northwest Expressway had been abandoned, and there had been no funds included in the county budget for the improvement, relocation and extension of Valley Road. It must be remembered that here the appellants brought an original suit in equity alleging that the action of the county council was arbitrary, capricious and illegal; hence its conduct must be reviewed in the light of the conditions that existed as of the date of its action, and not in the light of events which may have subsequently occurred. In *American Oil Company v. Miller,* 204 Md. 32, 38, 102 A. 2d 727, a case similar in nature to the instant one, this Court said, "Of course, in passing upon the decision of the Commissioners, we will consider only the facts and circumstances existing at the time the resolution was passed on June 10, 1952." Cf. *St. Mark's, Etc., Church v. Doub, supra,* 219 Md. p. 396. The chancellor ruled correctly in excluding this testimony.

The appellants' last contention is rather tenuous in nature. Section 532 (c) of the Baltimore County Code (1955) provides that the county commissioners [now the county council], after receiving the final report of the zoning commissioner, shall hold a public hearing or hearings thereon after giving at least 15 days' notice in a newspaper of general circulation throughout the county of the time and place of the beginning of such hearing or hearings. After the zoning com-

missioner had made his final report to the council and it had given the prescribed public notice, it began its hearings on December 12, 1956. At this hearing, certain of the protestants appeared and complained that they had been denied a full and proper hearing before the commissioner. The council stated that it thought the law had been complied with, and it did not believe that they had been denied a hearing before the commissioner; but it would continue its hearing until December 18, 1956, and request the commissioner to afford the parties an additional opportunity to be heard by him for the purpose of his making any additional recommendations that he might care to after the hearing. The commissioner held the hearing, but the protestants refused to offer any testimony or suggestions. The commissioner then made a report to the council stating that he had held the hearing pursuant to its request, that the protestants had offered no testimony or suggestions and that he was still of the opinion that his former recommendations concerning the subject property were correct. This report was made on or about December 15, 1956, and the council held another hearing on the date to which its first hearing had been continued, December 18, 1956. The appellants now argue that this last report of the commissioner was his "final" one, and, in order to comply with the statute, the council was required to advertise again and give at least 15 days' notice of its hearing; and, as it did not do so, its action in adopting the new comprehensive plat was a nullity. To merely state the argument refutes it. It would border upon the absurd to hold that parties, who are accorded the courtesy of receiving favored treatment which in nowise violates the law, could utilize that treatment to invalidate a very important legislative function. We find no error here.

*Decree affirmed, with costs.*