## THE JOBAR CORPORATION ET AL. *v.* RODGERS FORGE COMMUNITY ASSOCIATION, INC. ET AL.

[No. 433, September Term, 1963.]

*Decided July 24, 1964.*

The cause was argued before the entire Court.

*Melvin J. Sykes,* with whom was *Neil Tabor* on the brief, for the appellants.

*Charles C. W. Atwater* and *Paul J. Feeley* for the appellees.

PRESCOTT, J., delivered the opinion of the Court.

This is a zoning appeal. The Towson Building Company applied for a reclassification of a 6.14 acre tract of land on Stevenson Lane near York Road in the Towson area of Baltimore County, from R-6 (individual or semi-detached homes on lots not less than 10,000 square feet), as it had been zoned in the comprehensive zoning of 1955, to R-A (Residential Apartment). The Jobar Corporation, as contract purchaser, became an additional applicant.

On June 15, 1961, the County Board of Appeals (Board) denied the application, and the applicants appealed to the Circuit Court. On October 22, 1962, that court (Turnbull, J.) ordered the case remanded to the Board for additional testimony. Some protestants filed a motion to strike the remand;

after full hearing, Judge Turnbull denied the motion on March 6, 1963.

The Board pursuant to the order of remand, took additional testimony on July 25 and August 6, 1963, and granted the application on September 17, 1963. The protestants appealed; and the Circuit Court (Raine, J.), pursuant to an oral opinion delivered December 18, 1963, reversed the Board's decision and denied the application, stating "then everybody can see what the Court of Appeals will do with it." The applicants have appealed.

Appellants suggest there are four questions presented in the appeal, but in the view we take of the case, it may be determined by answering the following ones: (1) Was the remand to the Board of Appeals for the taking of additional evidence erroneous; and (2) Should the conclusions of the Board that the rezoning was justified by error in the original zoning and by changes in the character of the neighborhood, have been sustained by the court as at least fairly debatable?

I

We proceed to a determination of the first question before stating the facts, for if it be decided against the appellants, it will be unnecessary to state, or consider, the testimony taken at the second hearing before the Board.

Baltimore County is a chartered county. Appeals to the Circuit Court from the Board are therefore controlled by Section 604 of the Charter of Baltimore County, Section 501.4 of its Zoning Regulations, and Code (1957), Article 25A, Section 5 (U) (which are almost identical in terms relative to appeals), and not by Code (1957), Article 66B, Section 7 (n). *Montgomery County v. Ertter*, 233 Md. 414; *Baltimore County v. Missouri Realty Inc.*, 219 Md. 155; *Robertson v. County Board*, 210 Md. 190. These sections, in pertinent part, provide that upon appeal the court shall "have the power to affirm the decision of the Board or, *if such decision is not in accordance with law* (italics ours), to modify or reverse such decision with or without remanding the case for rehearing as justice may require."

The order passed by Judge Turnbull, on October 22, 1963,

was an *ex parte* one remanding the case to the Board for the purpose of taking additional testimony, and he stated the order was "in conformity with [Code (1957)] Art. 66B, Sec. 7 (n) * * *." Appellees complain that the order should not have been passed without first affording the appellees an opportunity to be heard. And in this contention they are correct. However, the error became harmless, for some of the protestants filed a motion to strike out the order, and, after a hearing thereon, the court denied the motion, stating that he had carefully considered the record before doing so. The hearing on this motion presented the protestants with an opportunity to present to the court any reasons as to why the order should not have been passed, which they could have presented before it was signed.

The appellees also state that Judge Turnbull had no power to pass the order "in conformity with Art. 66B, Sec. 7 (n)," and again they are right. We pointed out above the true sources of authority on appeals to the Circuit Court of this nature. It, therefore, becomes our duty to determine whether the court had the right to remand under the actual sources of authority, for nearly every judge, on occasion, finds that he is right, but for the "wrong reason."

The question turns upon whether the first decision of the Board was "in accordance with law." Throughout the first hearing, applicants' witness Gavrelis attempted to discuss the proposed use (and its effect) of the some 60 acres of the Sheppard Pratt tract obtained by the Greater Baltimore Medical Center (Center), which the appellants proffered to prove was a $10,000,-000 project with architects' plans and construction drawings and preliminary engineering completed, the sponsors were completely ready for financing (with the exception of $750,000, which was expected to be obtained within two months), and the breaking of ground was imminent. Appellants also offered evidence of the "very well laid plans for the development of [the some 28 acres purchased by] * * * the St. Joseph's Hospital * * *." In addition, appellants offered to prove that the county officials had demanded before beginning construction on any apartments (and they had agreed to such demand) a 70 foot right of way over the subject property from Stevenson

Lane on the south to the proposed hospital developments on the north.

The Board refused to consider evidence relative to the above projects because "we have nothing before us to show the building is under construction," "the Board cannot consider what is going to happen on [the] Sheppard Pratt property," "maybe Sheppard Pratt has some plans laid out too, but we are not allowed to listen to them." The Board stated further that "any testimony with regards to projects in the future would have the same objection from counsel, and would be sustained by the Board on the same objection, that such things that are in the future cannot have a bearing on the property at the present time." In other words, the Board felt that it was limited to a consideration of evidence of the situation existent at the time of the hearing, and no potential, even though imminent, future changes in that situation or future needs of the public could be considered.

Our previous decisions do not sustain such a conclusion. Of course, the comprehensive zoning map of 1955 was entitled to a presumption of correctness, and the burden was upon the applicants for reclassification to show an error in the map or a change of conditions in the neighborhood, or both, if they were to be successful. But in order to show a change in conditions, as was stated by Chief Judge Brune in *Rohde v. County Board*, 234 Md. 259, when quoting from *Trustees of McDonogh, etc. v. Baltimore County*, 221 Md. 550, the Board was entitled to consider (and therefore the applicants for reclassification were entitled to present) projects that were " 'reasonably probable of fruition in the foreseeable future.' " And the same rule applies, we think, when an applicant attempts to prove an error in original zoning. The Board, at its first hearing, was too restrictive in not permitting the applicants to produce evidence of the hospital projects which were reasonably probable of fruition in the foreseeable future; hence the Board's decision was not "in accordance with law," and the judge was warranted, under the provisions of law mentioned above, in remanding the case for the taking of additional testimony. (In making this ruling, we are not to be understood as holding that the courts, upon appeals, are required to review in detail and pass upon the tech-

nical admissibility of all the evidence offered before the Board. The instant case is unusual in that the Board refused to admit, or consider, the crucial matters upon which applicants' cause depended.)

The appellees contend that *Robertson v. Board of Appeals*, 210 Md. 190, is controlling, and that Judge Turnbull had no authority to remand the case for further testimony. That case and the instant one are different. In *Robertson*, Judge Hammond, for the Court, specifically stated that Judge Woodward had exceeded his power in two ways: "first, he remanded the case without finding an error of law, and second, he substituted his judgment on the facts for that of the Board." In the instant case, the trial judge did not substitute his judgment for that of the Board on the facts, and he was correct, as we stated above, in finding an error of law.

We now state the facts. The property here in question is a heavily wooded triangular parcel, located on the north side of Stevenson Lane, approximately 1000 feet west of York Road. It fronts 700 feet on Stevenson Lane (which runs east and west), and the western boundary of the property, which with Stevenson Lane forms the right angle of the triangle, extends north approximately 560 feet. The rear of the property closes the triangle from the northwesternmost to the southeasternmost point of the property.

There is a small, high, level area consisting of somewhat less than one-third of the tract at the southwest corner, from which plateau the land slopes very sharply, sometime exceeding 15 per cent to the northern and eastern borders.

Immediately to the west of the property is a 16 foot alley across from which, at approximately the same grade as the plateau on the subject property, is built Section 11 of the Rodgers Forge development. This section of Rodgers Forge is "one long area of group homes, divided into three groups of some 20 homes each," the backs of which face the subject property.

Directly adjoining the subject property on the north is a 400 acre tract known as the Sheppard Pratt property. This tract is now the subject of extensive hospital development. In addition to the Sheppard Pratt hospital itself, which has existed for some time, approximately 60 acres of the tract were

sold in 1960 to the Greater Baltimore Medical Center, a ten million dollar project formed by the merger of the Hospital for the Women of Maryland and Presbyterian Eye, Ear and Throat Charity Hospital.

Abutting the subject property on the south is Stevenson Lane. In 1955 this was a small twelve to fifteen foot road; in part a private drive. It was not connected to York Road on the east or Bellona Avenue on the west, and in fact, existed only in front of the row houses westerly from the subject property. It was not built in front of the subject property until 1957-58; and in 1955, when the zoning map was adopted, it had not been settled whether Stevenson Lane would ever be extended to connect with York Road and Bellona Avenue.

At present, however, Stevenson Lane is a fully paved forty-two to forty-four foot bituminous concrete road with a seventy to eighty foot right-of-way. It allows fourteen feet for traffic in each direction while cars are parked on both sides. It now extends from York Road, with its public transit facilities, on the east to Bellona Avenue and Charles Street on the west. As a result of the widening and extension, which occurred in 1961 and 1962, Stevenson Lane is now a major traffic artery known as a "connector" or "collector" or "main feeder" road between York Road and Charles Street and Bellona Avenue. Stevenson Lane funnels traffic between these two major north-south arteries away from the interior streets of residential developments, and is "a major connection between the center of Towson and Charles Street arterial traffic."

Opposite the west end of the subject property on the south side of Stevenson Lane are some row houses and two school sites, one elementary and one junior high. To the west about 1200 feet from the subject property are the Rodgers Forge apartments, built before the comprehensive zoning of 1955.

Across Stevenson Lane and opposite the east side of the subject property and lower than the plateau on the side of Stevenson Lane abutting the subject property are five single-family homes, built before any of the group homes in the neighborhood. These homes, a part of the Rodgers Forge development built before Stevenson Lane was developed, were constructed as part of an agreement entered into by James Keelty, the de-

veloper of Rodgers Forge, in consideration of the withdrawal
of objections by persons in the area to the extension of a com-
mercial use of property at Old Trail Road in which Keelty was
interested. This fringe of individual homes is one house deep,
and several rows of group homes are built immediately behind
(south of) these cottages, so that the single line of cottages
"strips out" the group home development on the south side of
Stevenson Lane, which is part of the overall group home and
apartment development of Rodgers Forge. Beyond the eastern
end of the subject property on the south side of Stevenson
Lane are two additional cottages filling out the strip of single
family homes.

To the east of the subject property on the north side of Stev-
enson Lane is a "finger" of Sheppard Pratt land; there is a
sharp slope to a stream which is channeled into a 48 inch storm
water pipe. Both the east and west sides of the stream are
heavily wooded with willow trees, and the stream lies in a deep
valley between the slope downward from the subject property
and a hill on the east side going back up to high ground. On
this ground to the east of the subject property are: the Shep-
pard Pratt land, the two heavily wooded hills, a driveway to a
farm house on the Sheppard Pratt property, the stream and
"severe drainage course," and after these barriers an older in-
dividual residence development known as Yorktowne. The land
separating the subject property from Yorktowne has a mini-
mum width of 105 feet and a maximum of 200 feet. The York-
towne houses are built with their backs to the stream between
Yorktowne and the subject property; and the Yorktowne house
fronts all face a circular drive known as Yorktowne Road.
Further east to York Road, which is a short distance away, are
more single family homes.

The northwest corner of Stevenson Lane and York Road is
used in an M-R (Manufacturing-Restricted category); and
across the street is a gas station, which was rezoned by petition
in 1950.

Two land use planners, both called by appellants, testified
before the Board of Appeals as to the issues of original error
and change of conditions. George E. Gavrelis, Deputy Director

of Planning in Baltimore County, who testified at the first hearing before the Board, said in direct examination that in his opinion R-A zoning was proper zoning for the subject property. On cross-examination he testified that R-6 zoning was not an error in 1955, although it was "suspect" and "maybe" erroneous even then, especially in the light of hindsight. Bernard Willemain testified for appellants before the Board at the second hearing. He had spent five years as the Deputy Director of the Baltimore County Planning Commission and was the draftsman of the Baltimore County Code. He testified that "it is my considered opinion that the map adopted November 14, 1955, zoning the subject property R-6 was in error in regard to that classification."

He gave as some of his reasons:

(1) The subject property is in the most concentrated development in the Towson area. There was, in 1955, no tract of six or more acres still vacant within at least a two mile radius, except the subject property and the Sheppard Pratt complex. The County Commissioners erred in failing to take into account the need for additional apartments in this area and to make available for such use the suitable tracts, which were limited to the subject property and the Sheppard Pratt complex.

(2) The Baltimore County zoning authorities failed to give proper consideration to the potential of the Sheppard Pratt property, which was bound to be developed much more intensively than R-20, which it was zoned in 1955, and to give proper weight to the fact that the subject property is more closely oriented to the Sheppard Pratt property than to any other land in the area.

The County Planning Commission in 1955 took into account both the need for apartments in the area and the inevitable intensive development of Sheppard Pratt by recommending R-A zoning for a portion of the Sheppard Pratt tract; and the R-6 zoning for the subject property was recommended on the basis that the Sheppard Pratt zoning adequately met the need for apartments. However, the County Commissioners, without any studies as to the need for apartments in the area and without any prior public announcement of their intention, removed the R-A classification of the land to the north of the subject prop-

erty and zoned the Sheppard Pratt complex R-20, without making any adjustment in the R-6 zoning of the subject property. The R-20 zoning for the extensive land to the north was wrong; and the R-6 zoning of the subject property, based on such R-20 zoning of the adjoining lands to the north was wrong: to assume as part of the comprehensive plan for greater Towson that 400 acres, virtually unoccupied, would remain unimproved, or with no more intensive use than existed in 1955 was "no plan at all," and the failure to provide for any apartment use in the area beyond the "Title 608" apartments at Rodgers Forge was clearly erroneous.

(3) In view of the topography of the subject property, the R-6 zoning denied a reasonable economic use, especially in view of the group homes at the same elevation, the backs of which face the subject property immediately across the 16 foot alley to the west. The line dividing the more intense R-G use from the R-6 zoning of the subject property was based merely on the existing Keelty ownership lines (which is, of course, permissible depending upon circumstances), and not upon proper zoning considerations. A use at least as intensive as R-G should have been permitted to the nearest natural line, namely the stream barrier located in the valley between the subject property and the lands to the east. Mr. Willemain also thought that the Maryland and Pennsylvania Railroad tracks and trestle served in 1955 (they have since been removed) as "a natural boundary in some regards."

(4) The subject property is, and was, the only vacant land on the north side of Stevenson Lane between York Road and Charles Street, which could provide any road connection between Stevenson Lane and the large tracts to the north. It was inevitable that the Greater Towson development, including the more intensive Sheppard Pratt development would have to have a connection with Stevenson Lane between York Road and Bellona Avenue. The only possible such connection was through the subject property. In fact, as a condition of the approval of any plan for the subject property, the Baltimore County Planning Department required the applicants, over their objection, to provide a 70 foot right-of-way at the east end of

the subject property for access from Stevenson Lane to the Sheppard Pratt property, in order to connect with the hospital being constructed directly to the rear of the subject property.

(5) The subject property was particularly suited to satisfying the need for apartments which should have been regarded by the zoners in 1955; the property is large enough to be built up as a separate tract, ideally shielded from the surrounding area, and site plans well for apartments—i.e., apartments cover a smaller area, fit well into the site, do not require extensive regrading, and preserve the trees.

The evidence before the Board relative to change in the neighborhood included the following. Both Mr. Gavrelis and Mr. Willemain agreed in their testimony that there were sufficient changes in conditions in the area since 1955 to warrant the rezoning. They stated these changes to be:

(1) The need for apartments in the area, especially garden apartments, which was not foreseen and provided for in 1955 by the zoning authorities has in fact increased sharply and must be met.

(2) The change in the character of Stevenson Lane, which under the circumstances in this case "perhaps more than any other land use consideration" could affect the character of the immediate neighborhood of the subject property has made Stevenson Lane into a logical separator between the subject property and the fringe of cottages stripping out the row house development on the south side of Stevenson Lane.

(3) The intensification of the land uses to the north, particularly the Greater Baltimore Medical Center. Mr. Gavrelis thought this was "the big factor that influences the judgment of myself and the Planning Staff in recommending the granting of applicants' request." He and the Staff knew "that with good site planning it [R-A zoning] can blend harmoniously with other types of residential and non-residential land uses. We know that apartments tend to produce less demands than typical row houses for schools, utilities and so forth. We feel, in relationship to Stevenson Lane, a 70 foot right of way * * * with a fairly close proximity to transit facilities on York Road [the subject property] appears to be a reasonable one for apartment zoning * * *." Mr. Willemain pointed out that the existing de-

velopment on three sides of the subject property constituted "only a small part of the area which is going to be developed, and which was considered by this map [of 1955], and which will have a direct bearing on the subject property because the subject property is the contact or connection between the Rodgers Forge development you [the lawyer] have described and the large Sheppard-Pratt property on the north, in addition to the traffic pattern. In my opinion, the subject property is oriented more importantly to the development of the Sheppard-Pratt property, because of the traffic that must be taken through it * * * as compared with the other properties * * * than to those that are already improved with other types of structures."

Mr. Willemain added that he thought there had been an intensification of the uses in the general neighborhood, (which was broader than merely Rodgers Forge itself since the subject property had to be viewed as one of the last remaining vacant tracts strategically located in the entire high density development area. There have been rezonings since 1955 adjacent to York Road, which (he thought) was "an integral part" of the neighborhood, and these establish that the 1955 zoning did not sufficiently provide for the development of this general area of the county.

There was abundant evidence to support the Board's findings that the rezoning in the instant case would not "materially increase population density nor affect adversely any of the conditions of traffic, health, safety, morals or welfare."

The protestants offered but one witness, a real estate expert, who testified that in his opinion R-A zoning for the subject property would lessen the values of properties "in the immediate vicinity," and have "a minor effect" upon the residences across Stevenson Lane. The applicants offered another real estate expert, who stated that such zoning for the subject property would have *no* effect upon property values to the surrounding properties.

After the Board heard and considered the additional evidence adduced at the second hearing in conjunction with that taken at the first, it found that it was "evident that changes have occurred in the vicinity of the subject property since * * * 1955. Noteworthy among those changes is the construction and

opening of Stevenson Lane, a major boulevard * * *." The Board also stated Mr. Willemain's testimony was "extensive," and the Board was "impressed with the testimony of Mr. Willemain regarding the error which he believes was committed when the Ninth District land use map classified the subject property as R-6." [1] The reason mentioned in the footnote was only one of those given by Mr. Willemain as to why there was error in the original zoning. The Board went on to point out the difficulties in developing the subject site in its present category due to the sharp topographical changes, and found that applicants' plan of development "would not materially increase population density nor affect adversely any of the conditions of traffic, health, safety, morals or welfare." It is obvious that the Board could have been more specific and definite in its findings of fact; however, it is certain that the Board found that there had been changes in the neighborhood and error in the original zoning sufficient to justify the reclassification (its other findings clearly meet the test of being fairly debatable, so it will be unnecessary to discuss them further). We have stated time after time that it is not the function of the courts to zone or rezone, and the courts will not substitute their judgments for that of the expertise of the zoning officials. It is only where there is no room for reasonable debate or where the record is devoid of substantial, supporting facts that the courts are justified in reversing a decision of the Board, or declaring its actions arbitrary or capricious. See *Montgomery County Council v. Scrimgeour,* 211 Md. 307, *Temmink v. Board,* 212 Md. 6,

---

1. During the course of its opinion, the Board erroneously stated that Willemain had testified that the Planning Board had originally recommended the subject property for R-A zoning. What he actually testified to was that property immediately to the north had been recommended for R-A zoning to take care of the then existent, and obvious future, need for apartments, and, on the assumption that this property to the north would be zoned R-A and provide the public with needed apartments, the subject property was recommended to be zoned R-6. However, the County Commissioners zoned the property to the north R-20, and made no change in the subject property from R-6, which left a deficiency in R-A zoning, and the subject property was about the only tract available for the purpose.

and *West Ridge, Inc. v. McNamara,* 222 Md. 448, for three of the many Maryland cases so holding. Therefore, we must apply these tests to the evidence produced before the Board in order to determine the case at bar.

After doing so, we are constrained to hold that there were substantial, supporting facts presented to the Board, and its findings on changes in the neighborhood and error in the original zoning were fairly debatable. We begin with a presumption that the rezoning was reasonable and valid. *Mettee v. County Commissioners,* 212 Md. 357. This presumption, though less strong in instances of rezoning than in cases of original zoning, is a substantial one genuinely to be accorded by the courts. *Missouri Realty v. Ramer,* 216 Md. 442. In the case at bar, the Deputy Director of Planning and Mr. Willemain who had previously served five years in that capacity, both testified to the public need for apartments in the vicinity of the subject property. They both thought, for reasons stated above (and we shall not repeat them here), that there had been sufficient changes in the neighborhood to justify the reclassification. The Staff of the Planning Department felt likewise, and there is no testimony to the contrary. We cannot say, with the above testimony of recognized experts in the field of zoning in the record, that the record is devoid of substantial, supporting facts to justify the action of the Board, if it chose, as it obviously did, to accept the opinions of these witnesses. We therefore hold that the evidence before the Board was sufficient to render the question of change in the neighborhood fairly debatable. Cf. *Rohde v. County Board, supra.* To hold otherwise would be simply to substitute our judgment for that of the Board.

We turn to the question of error in the original zoning. Again, we start off with the same presumption of validity. The Deputy Director of Planning did not consider the R-6 zoning of the subject property in 1955 to be an error in original zoning, although it was "suspect" and "maybe" erroneous then. Mr. Willemain stated that it was his "considered opinion" that the R-6 zoning was error in the original zoning, and gave his reasons for reaching that conclusion (again we do not repeat them here). Although the above may constitute some conflict in the testimony relative to original zoning, we are unable to conclude

that this left the record barren of substantial, supporting facts relative thereto. The Board stated that it was "impressed with the testimony of Mr. Willemain regarding the error" in original zoning, and if it decided to accept his opinion for the reasons given by him, we cannot, under our previous holdings, reverse the Board's action, in the absence of a showing that the acceptance of the opinion was arbitrary and capricious in a legal sense. Cf. *Rohde v. County Board, supra.* Consequently, we hold that the question of error in the original zoning was fairly debatable.

What we have stated and held above, necessitates a reversal of the order passed below.

> *Order reversed and case remanded for the entry of an order in accordance with the above opinion; appellees to pay the costs.*

HAMMOND, J., filed the following dissenting opinion, in which HENDERSON and MARBURY, JJ., concurred.

The world will not cease to revolve, disaster will not have struck, and chaos will not reign if the opinion of the majority becomes the law and the contract purchaser of the property involved happily pays the owner the top dollar for his six acres plus, but I think a most unfortunate disservice will have been done to the law of zoning and to the law of administrative bodies. Moreover, no real harm will result in this case if the garden apartments, rather than individual homes, are built on the subject acreage. But, clearly, this is not the point. If rezoning can be allowed to stand when the requisites either of original error or substantial change in the neighborhood that this Court has so laboriously and painstakingly established case by case have not been shown, the system rests on sand and each case will stand on an ad hoc basis. The fact that in this case no harm will result, or that the change would not be inappropriate, is a specious reason for approving the rezoning, for the precedent thus set will be used and reused to grant rezoning when the change would be unworthy and against the general public good.

I am constrained to dissent because I am convinced it can be demonstrated that at the original hearing before the Board there was no evidence of either original error or substantial change (indeed, the applicants for rezoning themselves proved the contrary by their own witnesses) ; that the Board's decision was in accordance with law so that the Circuit Court lacked power to remand the case for a second hearing; and the testimony at the second hearing left no room for debate as to error or change. I read the opinion of the majority as based on factual misconceptions and the ignoring or disregarding of established and controlling decisions of this Court which compel a conclusion contrary to that reached.

The chronology of the case is most important. The application for rezoning was refused by the Zoning Commissioner of Baltimore County on March 8, 1960. On March 16 an appeal was entered to the Board of Appeals. Exactly one year later, the first hearing before the Board took place and three months later the Board upheld the Zoning Commissioner and refused the application.

Sixteen months later, on October 22, 1962, Judge Turnbull remanded the case to the Board. Seven months thereafter, on May 27, 1963, Judge Berry refused to strike Judge Turnbull's order and again remanded the case to the Board. Judge Turnbull (in the mistaken belief that Code (1957), Art. 66B, Sec. 7 (n)—"[t]he Court may * * * modify or remand for further consideration, any decision of the board of appeals"—applied), remanded the case on a petition to remand that alleged that "[y]our Petitioners have bona fide *new* evidence relating to matters not testified to at the hearing of the Baltimore County Board of Appeals, which evidence is material to your Petitioners' case," and that "[t]he evidence which your Petitioners desire to present * * * concerns * * * the following matters :

(a) Evidence dealing with the progress of construction of the Greater Baltimore Medical Center, which is now under construction on the Sheppard Pratt tract of land which adjoins the subject property to the north, and the change in the neighborhood resulting therefrom.

(b) The evidence of a qualified expert land planner or consultant with reference to the zoning pattern of the subject property and the surrounding neighborhood;"

and asked for remand under Sec. 7 (n) of Art. 66B. (On January 15, 1964, months after the second hearing of the Board and the reversal of the Board's action by Judge Raine, Judge Turnbull filed a statement of grounds for his decision of October 22, 1962.)

On July 25, 1963, additional testimony was taken by the Board of Appeals and on September 17, 1963, the Board reversed its first order and granted the requested reclassification. On December 30, 1963, Judge Raine reversed the Board's finding—correctly, I have not the faintest doubt—holding that on the record there was no basis for a finding of original error or a change in circumstances. The appeal in the Court of Appeals was argued on June 19, 1964, more than three years after the first hearing before the Board. Much of the appellants' argument was devoted to current circumstances and events, and a claim that the current picture justifies what was done in 1963 and makes, nunc pro tunc, what was done in 1961 wrong.

The appellants produced at the first hearing only five witnesses. The first was an officer of the Jobar Corporation, the potential developer, whose testimony was only as to the desirability, from his point of view, and the profitability, of building garden apartments rather than houses on the site. The second was George E. Gavrelis, Deputy Director of Planning for Baltimore County. When he was asked whether the zoning of the subject property as R-6 in December of 1955 (the date of the last comprehensive rezoning) was error, he said (having just before said his opinion reflected that of the Planning staff) : "I believe that * * * R-6 zoning was a good choice," and added "[i]n December of 1955, R-6 zoning was correct." He was asked then if he would say "there was no error in the original zoning," and he said "I believe no." When he was asked whether there had been changes "in the neighborhood of this particular subject property since November of 1955," he replied :

"The changes that occur to me are not changes which one can point to as being a reclassification of property or *necessarily even a change or development of property within the context of the potentials which the zoning map allowed.* I think, the big factor that influences the judgment of myself and the Planning staff, of course, is the one which is at issue, the fact that the resulting land uses in the Sheppard Pratt Hospital complex are going to be different." (emphasis supplied).

When asked: "What have been the changes in the neighborhood of this property since November of 1955 up to today," he answered: "There have not been any changes in the zoning map in this immediate area."

Finally, he testified: "I think the property could very well be developed with R-6, either as single families or semi-detached. I don't mean to say it can't. And I believe that R-A is now a more appropriate use than R-6."

The third witness was Jerome Wolff, Assistant Director of Public Works of Baltimore County, and the fourth, an engineer, both of whom testified as to the development of Stevenson Lane from an eighteen foot to a forty-two foot street. (The majority opinion adopts the view that Stevenson Lane "is now the major connection between the Center of Towson and Charles Street arterial traffic." The center of Towson is about two and one-half miles from the subject property and about two miles north of Stevenson Lane, and neither in 1961 nor now would a motorist in the center of Towson who was going to Charles Street, nor a motorist on Charles Street going to the center of Towson, think of going by way of Stevenson Lane unless he happened, at the moment, to have a lot of excess time and energy to devote on the way to fighting frustratingly York Road traffic and traffic lights.)

The fifth witness was a traffic expert whose testimony was not needed because it was stipulated that traffic on Stevenson Lane was not a problem and would not be if the reclassification were granted.

Clearly, there was nothing before the Board, from any of this testimony, to justify a reclassification in 1961.

The matter of the future building of the Greater Baltimore Medical Center and of St. Joseph's Hospital arose at the 1961 hearing in this way. Mr. Gavrelis had said he and the Planning staff, as planners, "had no objection to the reclassification" because they felt "that the proposed apartment use was an appropriate and reasonable use. We based our concurrence on the fact that we know, within Baltimore County, there is an increasing need to make provision for more rental housing." He was then asked if he had other reasons why he "favored this application." He answered: "The relation of this tract to the proposed hospital expansion."

There was an objection and the chairman of the Board said: "I think you can proffer what he is going to say, but the Board would rule any evidence with regard to future hospital expansion is not admissible." It is to be noted that in the record then was Mr. Gavrelis' testimony that his concept of change in the neighborhood was that the new hospitals would produce "resulting land uses in the Sheppard Pratt hospital complex [that] are going to be different." Counsel for the appellants suggested that "the hospital" now owned the land but no proffer was made, as suggested. The chairman continued:

> "Well, it is expansion of the hospital that you are interested in, and there is nothing to guarantee that the hospital will be expanded. We have seen that many times where hospitals have been proposed and never been completed. We have nothing before us to show the building is under construction or anything else,"

and the matter was dropped.

On cross-examination Mr. Gavrelis said he did not limit his ideas of changes in the neighborhood to reclassifications or zoning changes and that he included in his concept changes resulting from "potential land uses" which had not originally been anticipated. The chairman said to the witness: "Instead of giving us your definition of what constitutes changes, let us get on to this particular case. * * * You have already stated that there are no zoning changes, so they come under some of these changes that you are referring to. Let us get specific." Mr.

Gavrelis then reiterated that in the last five years since the comprehensive zoning map was adopted there had been an increase in newly formed families and families whose children had grown up and left home (the newlywed and the nearly dead), and "we *anticipate* a greater and greater demand for rental housing."

The chairman then asked: "What will be another change?" Mr. Gavrelis replied:

> "I think the other change is the very well laid plans for the development of the Baltimore Medical Center, and St. Joseph's Hospital on Sheppard Pratt.
>
> * * *
>
> *"I did not mean to imply that the proposed uses of Sheppard Pratt would change the character of the neighborhood. I certainly do mean to say* that the uses we are confident will come about on Sheppard Pratt will institute a whole new series of the need for making an entire new series of judgments and decisions and recommendations with respect to future land use in this area, which, I think, has a bearing on this petition." (Emphasis supplied)

There was another objection, and the chairman said:

> "If what Mr. Gavrelis says here now, I think is exactly the point you made, and I agree with you. If the proposed changes in Sheppard Pratt are going to bring about a complete change of thinking and layout and plans for this area, it will have to be done at the time those plans are formulated. We can't take into consideration now what may connect, or if they develop Sheppard & Pratt Hospital. I agree with that."

The majority opinion says:

> "Throughout the first hearing, applicants' witness Gavrelis attempted to discuss the proposed use (and its effect) of some 60 acres of the Sheppard Pratt tract obtained by the Greater Baltimore Medical Center (Center), which the appellants proffered to prove

was a $10,000,000 project with architects' plans and construction drawings and preliminary engineering completed, the sponsors were completely ready for financing (with the exception of $750,000, which was expected to be obtained within two months), and the breaking of ground was imminent. Appellants also offered evidence of the 'very well laid plans for the development of [the some 28 acres purchased by] * * * the St. Joseph's Hospital * * *.' " [1]

These statements are erroneous in several regards in fact and in emphasis. Mr. Gavrelis' only meaningful references were in the manner and to the extent the testimony which has been quoted above indicates. Mr. Gavrelis testified flatly that these hospitals *would not change the character of the neighborhood.* All he foresaw was a new need "for making an *entire new series of* judgments and decisions and recommendations with respect to future land use in this area." The appellants did not offer to prove that the Greater Baltimore Medical Center was a $10,000,000 project with architects' plans and preliminary engineering completed; in fact they proffered no testimony as to this hospital. What they did say was this. When the appellants had finished putting on their testimony, their counsel said:

---

1. The Court seems to think that the Greater Baltimore Medical Center and the St. Joseph's Hospital projects adjoin the subject property and were in 1961 ready to be built. As a matter of fact, the distance by road from the subject property to the Greater Baltimore Medical Center is two and seven-tenths miles, and the distance as the crow flies must be well over a mile. By road to the St. Joseph's site is over a mile. The two hospital sites are a mile to a mile and a half apart. One cannot see Greater Baltimore from the subject property or, from most parts of the property, at least, cannot see the St. Joseph's site. St. Joseph's construction now, three years after the 1961 hearing, is hardly begun. The bare steel shell is up in part for Greater Baltimore.

The majority seemingly also thought the proposed road in a seventy-foot right of way was to lead to the "hospital developments on the north." The testimony was that the new road would go straight north to the new westward extension of Burke Avenue (currently being built). It would go near the new St. Joseph's Hospital; it would not go within a mile of the Greater Baltimore Center or connect with it.

"If it please the Board, due to the manner in the way the case has developed,—I know this is perhaps somewhat unusual,—I would like an opportunity to check, and present evidence dealing with respect to the status of both the Greater Baltimore Medical Center and St. Joseph's Hospital, and the proposed road through this property, or adjacent to it,—which we are not prepared to do at the present time. We ask for a day or several days in order to bring in witnesses on that point."

The protestants objected, pointing out that it had been a year since the hearing before the Zoning Commissioner and that they had agreed with the applicant to several postponements before the Board. Counsel for the appellants then said "we were considering the probability of bringing in an expert on planning. We canceled this idea due to the status of Mr. Gavrelis' testimony prior to his being taken under cross-examination. We were, frankly, surprised with some of his testimony * * *."

Counsel for the protestants again said that Mr. Gavrelis' testimony was completely consistent with that he gave before the Zoning Commissioner.

The chairman said he felt the Board had no alternative but to refuse the postponement. He then said that "with regard to the hospital situation * * * which certainly clearly, if the Board did not know from common knowledge" showed these hospitals to be projects in the future.

Counsel for the appellants then said that he would like an opportunity "to have witnesses here, from which I could at least *proffer* testimony which I *expect* to be along the following lines * * *," that his possible proffer was that the construction drawings for the St. Joseph's project were complete and that the preliminary engineering had been done, and that the total building costs would be $10,000,000, which was already financed with the exception of $750,000, and they hoped to have the financing complete within two months (as we have noted, the St. Joseph's project is not yet above ground). Counsel continued: "Surely it is in the future, like tomorrow is in the future * * *," but that he felt he should have an opportunity to

proffer testimony if he could get it. No proffer was suggested as to the Greater Baltimore Medical Center.

The Board chairman again said that the Board felt that they had no choice but to refuse a postponement, saying: "with further regard to Mr. Gavrelis' testimony, the Board would certainly be setting an awfully dangerous precedent if we were to allow for a postponement on that basis. * * * We would have to postpone and postpone and postpone, if we were to allow postponement on the basis of one of your own witnesses would testify different than you expected."

It seems clear that the Board did not abuse its discretion in refusing to grant a postponement in order to permit the appellants, who had had a year in which to prepare their case and had been granted several postponements, an opportunity to make a possible proffer which would not add anything to what the Board had already been told by Mr. Gavrelis and to permit the appellants to check the transcript to see if they needed to call another expert witness to contradict the expert they had already called as their own witness, but who, limited by his professional integrity, had let them down, if not destroyed their case.

Mr. Gavrelis was clearly right when he said that the hospital projects would nòt change the character of the neighborhood, either legally or practically. At the time of the zoning map adoption in 1955, the Sheppard Pratt Hospital owned four hundred acres of ground adjoining the woods to the north of the subject property. Hospitals are permitted uses in residential districts in Baltimore County and we have held that a use permitted by the Legislature in such a district, even though it might be not a residential use in the commonly thought of sense (in one case an armory and in the other a powerhouse adjacent to a church), did not change the character of the neighborhood within the meaning of the zoning law sufficiently to support a rezoning. *Montgomery County v. Ertter*, 233 Md. 414; *Levy v. Seven Slade, Inc.*, 234 Md. 145. There was no showing that there would be any significant or pertinent practical effect on the subject property by the building of these hospitals which were a considerable distance away from it.

The majority opinion says:

"The Board at its first hearing, was too restrictive in not permitting the applicants to produce evidence of the hospital projects which were reasonably probable of fruition in the foreseeable future; hence the Board's decision was not 'in accordance with law,' and the judge [Turnbull, J., who had not even thought of such a thing at the time] was warranted, under the provisions of law mentioned above [Sec. 501.4 of the Zoning Regulations of Baltimore County and Code (1957), Art. 25A, Sec. 5 (U)] in remanding the case for additional testimony." (Curiously, when the case was remanded and reheard, the appellants produced no evidence of the imminence of the hospital projects or of their effect on the subject property or the neighborhood, if they came into being.)

The statement of the majority has fatal flaws in premises and conclusions. There was no witness offered to the Board who did or could testify as to the likelihood of the fruition of the projects. The suggestion after the testimony was closed that the appellants *might* be able to produce such testimony was too vague and insubstantial to make the Board's rejection of a postponement an abuse of discretion. Mr. Gavrelis assumed both in his direct testimony, which the Board received, and in his testimony on cross-examination, which the Board received, that both the hospital projects would be built in a few years and would then require new thinking and new judgments and said, for the Board's consideration: "I did not mean to imply that the proposed uses of Sheppard Pratt would change the character of the neighborhood." Thus he recognized and gave as his opinion as a practical matter, under his expanded concept of change, what this Court said in *Ertter* and *Seven Slade, Inc.,* that actual building in a residential zone, as permitted by law, of structures not commonly thought of as residences does not as a legal matter constitute change.

There was absolutely no evidence before the Board—and none proposed—at the first hearing which would have justified any action but a denial of the requested rezoning. It is absolutely apparent that if the Board had received and listened to

every possible word Mr. Gavrelis—the only witness offered on the point either at the first or second hearing—could give on the building of the new hospitals, it would have had before it no more than it actually had. It is equally clear that nothing it had before it and nothing Mr. Gavrelis could have added would have shown original error or subsequent change, either legally or practically. Mr. Gavrelis' testimony in fact was directly to the contrary. Thus the decision of the Board clearly was in accordance with law and the Circuit Court had no power to remand the case. The majority have chased a mirage, and based a decision on a strawman they have created.

*Robertson v. Board of Appeals,* 210 Md. 190, 196-197, held flatly that under the same statute with which we are dealing the Circuit Court is without fundamental power to remand a case for further testimony unless the Board acted not in accordance with law. The Board in the instant case acted completely in accordance with law and the remand for a second hearing was void and meaningless, under *Robertson,* and the first decision of the Board denying rezoning should stand.

If it be assumed—a strained assumption—that the remand was proper, the result is not changed. Judge Raine, passing on the merits, found: "The general character of the neighborhood has not changed. The street has been widened, but the subject property is still essentially residential [individual homes]" and, he went on, surrounded by residences. Referring to the widening of Stevenson Lane, Judge Raine said:

"* * * that change took place prior to the Board's first hearing in 1961 and it was not considered by the Board in 1961 as a basis for reclassification. It seems to me to be capricious on its face for the Board to ignore the Stevenson Lane change in 1961 and then to try to use it now as a support for a reversal of its prior decision, so I don't see any evidence legally sufficient to justify the reclassification on the basis of change, so now we come down to the question of error in the original zoning which took place in the adoption of the Land Use Map by the County Commissioners in 1955."

As to error, Judge Raine said, correctly:

"All we have is the opinion of a so-called expert planner and it seems to me that there is no stability whatever in zoning if the zoning authorities can reclassify merely because an expert planner comes in and says, in my opinion, there was a mistake. I do not believe that that opinion can support a reclassification unless the opinion is so clearly correct as to amount to a demonstration that there was mistake."

This is saying that an opinion of a planning expert is no better than the reasons he said underlay it. *Greenblatt v. Toney Schloss Properties Corp.,* 235 Md. 9. In that case the expert said that there had been error in the 1957 comprehensive rezoning plan because the legislative body had used the boundary line of a tract of land rather than a natural drainage course as the dividing line between R. 40 and R. 20 zoning (there, as here, the lot in question could have been used in 1957 and at the time of the hearing either for R. 40 or R. 20 development, but it would have been more profitable to use it for R. 20). We said of the opinion of the expert: (pp. 12, 13-14)

"His opinion, however, was entitled to no more force and effect than the reasons he said underlay it. * * * The witness admitted frankly that the land could be developed for either R. 20 use or R. 40 use (as was contemplated when it was zoned) * * *.

"It is our opinion that under the controlling standards the Board had no right to grant the reclassification. * * * 'there is a strong presumption of the correctness of original zoning and of comprehensive rezoning, and * * * to sustain a piecemeal change therefrom, there must be strong evidence of mistake in the original zoning or in the comprehensive rezoning or else of a substantial change in conditions.' *Shadynook Imp. Assn. v. Molloy,* 232 Md. 265, 269-270, and cases cited. * * * In our view, no probative evidence of error in the zoning of the property in 1957 was presented to the Board. The most that the applicant for change showed and all that the Board decided was that

134

the drainage course would be a logical place to draw the line because the actual development of the R. 40 and R. 20 areas nearest the property had been such as to make the tract in question more compatible with its neighboring land to the west than with the land to the east. Assuming this to be true, it does not show original error. It was logical and appropriate to use the property line as a boundary in 1957. Perhaps ideal or even more nearly ideal planning in 1957 would have foreseen the way in which the developers would put in streets and lots and have enabled the zoning legislators to use the drainage course as a preferable boundary, but this does not mean that it was then error in a legal sense to have used the property line. 'It hardly needs to be said again that in zoning a line of demarcation must be drawn somewhere,' (*Shadynook, supra,* at p. 272 of 232 Md.), and the use in 1957 of a property line which was then proper and appropriate (as is shown by the fact that in 1964, as has been true from 1957 on, the property can be as well developed for R. 40 use as for R. 20 use, according to the uncontradicted testimony) was not error simply because it is now revealed that subsequent events (the manner of development of contiguous lands) have made it more logical or desirable or economically profitable that the division line be a natural contour line.

"Its rough topography will limit the number of lots into which the tract can be divided whether it remains R. 40 or is reclassified to R. 20. Only nine one acre lots or thirteen half-acre lots can be carved from the twenty-one acres."

The majority cite five alleged reasons the expert planner gave for believing there was original error:

1. Need, unrecognized in 1955, for additional apartments in the area (which was entirely unsupported by facts or specifics). We said in *Seven Slade, Inc.,* of a similar argument as to the Pikesville area by the same expert: "'The claims of original error were

so insubstantial as to be almost fanciful and do not merit discussion." (p. 154) Judge Raine said, and he is right, "[t]here isn't a shred of evidence in the record to demonstrate that" (a factual need for apartments).

2. The potential development of the Sheppard Pratt tract. There was no evidence at the second hearing on this or its effect on the subject property.

3. Difficulty of development of homes of subject property because of topography. Every witness agreed the property could be feasibly developed for homes. It just would not be as profitable as would apartments. Greater profitability, as many cases have held, is no reason for rezoning. See *Greenblatt v. Toney Schloss Properties Corp., supra,* one of the latest.

4. A proposed new road through the subject property. Homes can be built on or near roads, and sold, as easily as apartments.

5. The property is suitable for apartment use. It is also suitable, although less so, for home sites. This is no real reason.

All Mr. Willemain in substance said was that the subject lot was suitable and appropriate for apartments and that in his undocumented opinion Baltimore County and this general area needed apartments, ergo it was error not to have zoned this lot R-A in 1955. This is no evidence of error whatsoever. *Greenblatt v. Toney Schloss Properties Corp., supra; Shadynook Imp. Assn. v. Molloy,* 232 Md. 265, 269-270.

On the matter of change the Board found evidence thereof in the widened road and the fact that the planners had recommended the subject lot for R-A in 1955 (actually the Board mistook Mr. Willemain's testimony—he said the planners recommended the area north of the lot for R-A) and the Commissioners rejected their advice.

As Judge Raine pointed out, the Board found no evidence of change in 1961 because of the widened road and made a mistake in its premises as to the zoning action in 1955. Certainly a rejection by the legislative body of the planners' advice is not

per se error. There was nothing before the Board to debate on change. It is clear to me that the Board felt it was coerced by higher legal authority—the Circuit Court—into reversing its first ruling, which was correct.

If the second hearing is to be considered, Judge Raine's reversal of the Board should be affirmed.

Judge Marbury concurs in the views herein expressed. Judge Henderson agrees that the remand was not proper and that there was no evidence that would permit the Board to find either original error or subsequent change, since intensified hospital uses of the land to the north would not constitute either.