WOODLAWN AREA CITIZENS ASSOCIATION, INC.
ET AL. *v.* BOARD OF COUNTY COMMIS-
SIONERS FOR PRINCE GEORGE'S
COUNTY ET AL.

[No. 96, September Term, 1965.]

188

*Decided January 21, 1966.*
*Motion for rehearing filed February 4, 1966, denied and majority opinion modified February 7, 1966.*

The cause was argued before HAMMOND, HORNEY, OPPEN-HEIMER, BARNES and McWILLIAMS, JJ.

*Walter H. Maloney, Jr.,* for the appellants.

*William L. Kahler,* with whom were *DeBlasis & Kahler* on the brief, for the applicants for rezoning, part of the appellees.

*Harry L. Durity,* with whom was *Lionell M. Lockhart* on the brief, for the Board of County Commissioners, the other appellee.

HAMMOND, J., delivered the majority opinion of the Court. BARNES, J., dissents. Dissenting opinion at page 201, *infra.*

Nearby homeowners in a presently relatively rural suburban

area in Prince George's County are appealing the action of the District Council in changing some forty-seven acres of undeveloped and, for the most part, heavily wooded land surrounded by individual homes and schools from its present zoning for detached houses for one family, a status it has had since the last comprehensive zoning of that part of the County in 1949, to land zoned for garden apartments so as to permit some eight hundred families to occupy the forty-seven acres rather than some two hundred, if the zoning remained unchanged.

This is the third time the neighbors have entered the lists to defend the character of their environment. In 1955 the owners of the property under consideration sought its reclassification from R-55 (single family detached homes) to R-35 (two attached single family residences). When opposition to the change loomed strong, the owners sought to withdraw the application for change. The District Council chose not to acquiesce in the withdrawal but to dismiss the application.

In October 1961 the owners tried again to secure the right to use their land to house more families than the zoning in effect permitted, asking for reclassification from R-55 to R-18, which would have then permitted some nine hundred fifty so-called garden type apartments on the forty-seven acres. This application was recommended for disapproval by the Technical Staff of the Maryland-National Capital Park and Planning Commission on the grounds that there had been neither original error nor substantial change, but the Planning Board rejected the recommendation and approved the application. The District Council dismissed the application after a hearing at which neighboring owners protested, and the owners appealed to the Circuit Court for Prince George's County. On October 9, 1962, Judge Loveless sustained the action of the District Council, necessarily holding in so doing that it was supported by sufficient evidence that there had been neither mistake in the original zoning nor a change in the character of the neighborhood. No appeal was taken to this Court.

In the Spring of 1963 the owners of the property renewed their efforts to have it rezoned for garden apartments. Again the Technical Staff recommended denial of the application for the same reasons it gave in 1961. Again the Planning Board

recommended approval and this time, after a hearing on June 19, 1964, the District Council without giving any reasons or bases for its decision granted the reclassification to R-18 on September 15, 1964. At the hearing the District Council refused to accede to the motions of the protestants that the 1962 affirmance by the Circuit Court of the action of the Council in refusing rezoning in 1961 was res judicata and settled the status of the land either as of the date of the Council's action in 1961 or the court's affirmance in 1962, and announced that it would not receive in evidence the record of the 1961 hearing (which the protesting neighbors proffered), and that it would consider all changes since 1949 and the other factors it customarily took into account in deciding whether to rezone without particular reference to what had happened in 1961-62. On appeal, Judge Parker found the principles of res judicata to be the law that controlled but decided that certain changes in classification after 1961-62 justified the action of the Council, despite its lack of revelation of the basis of its decision and despite the fact that the record before the Council did not show when the changes he relied on had occurred or whether they were paper or actual changes.

The appellants, the protesting neighbors, appealed Judge Parker's order of affirmance and urge upon us a number of errors, each of which they argue justifies reversal, including procedural errors of the Council such as its failure to state findings of fact and conclusions of law and its receipt of and reliance upon unsworn testimony. We find it unnecessary to discuss or decide the various contentions because we conclude that the principles of res judicata were controlling and find in the record no evidence of significant change in the neighborhood of the property between 1961 and 1964, which means that the action of the Council in rezoning in 1964 on essentially the same facts and conditions it found insufficient to permit rezoning in 1961 was arbitrary, capricious and illegal.

The District Council has no inherent power to zone or rezone. These powers are entirely delegated by grant of the General Assembly, as we pointed out in *Perry v. Board of Appeals*, 211 Md. 294. At the time the matters now under review were taking place, Code (1957), Art. 66B, §§ 21-37, the basic zon-

ing enabling act for municipal governments other than towns and cities with a population over 100,000, applied to Prince George's County, but § 35 said explicitly that these sections supplemented the system of planning and zoning in the Regional District of Montgomery and Prince George's Counties as spelled out by Ch. 992 of the Laws of 1943, as amended, and directed that within the District the respective Boards of County Commissioners acting as a district council should exercise zoning powers, and then provided "* * * that in so far as the provisions of this subtitle may be inconsistent with or contrary to the provisions of Chapter 992 of the Laws of Maryland of 1943, as amended; such provisions shall have no application within the Maryland-Washington regional district * * *."

The provisions of Ch. 992 and other planning and zoning provisions applicable in Prince George's County were repealed by Ch. 780 of the Laws of 1959, which enacted new sections on these subjects, which were in effect in 1961 and 1964, including §§ 78 and 79 and codified in the Code of Public Local Laws of Prince George's County (1963) and which delineated the extent and character of the right to rezone an individual piece of property and imposed limitations on that right.[1]

Section 59-83 of the Code of Public Local Laws of Prince George's County (1963) provided two prerequisites to rezoning: submission of the proposed change to the Planning Commission (now the Planning Board) for its approval, disapproval or suggestions, and a public hearing after appropriate public notice. Section 59-85 (a) made mandatory a stenographic transcript of each such hearing. An appeal to the Circuit Court was granted by § 59-85 (e) to "* * * any person aggrieved by a final decision of the district council * * *." On the appeal, to be heard without a jury, the trial judge under § 59-85 (i) could affirm or remand for further proceedings or could reverse or modify "the decision" if the appellant's substantial rights had been prejudiced:

---

1. Amendments to the provisions as to zoning and rezoning in the Regional District in Prince George's County as enacted by Ch. 780 of the Laws of 1959 were made by Chapters 624, 854, 873 and 898 of the Laws of 1965.

"* * * because the administrative findings, inferences, conclusions, or decisions are (1) in violation of constitutional provisions; or (2) in excess of the statutory authority or jurisdiction of the agency; or (3) made upon unlawful procedure; or (4) affected by other error of law; or (5) unsupported by competent, material and substantial evidence in view of the entire record as submitted; or (6) against the weight of competent, material and substantial evidence in view of the entire record, as submitted by the agency; or (7) arbitrary or capricious."

Thus it is clear that the General Assembly imposed definite conditions and restrictions on the power and the right of the District Council to rezone in individual instances. The Council does not act as a plenary legislative body, it acts as an adjudicatory agency in large part. It must follow statutory authority and procedure, it must act lawfully, it must find support for its action in competent, material and substantial evidence adduced at a public hearing of which a transcript is made, and it must not act arbitrarily or capriciously. When the General Assembly enacted Ch. 780 of the Laws of 1959, the repeated decisions of this Court had clearly established that to justify a deviation from comprehensive zoning a change must be supported by evidence either of error in the original zoning or of a substantial change in the character of the neighborhood. The General Assembly is deemed to have known of this established rule and to have meant, in enacting Ch. 780 of the Laws of 1959, that unless the competent, material and substantial evidence at the hearing before the District Council fairly permitted a finding of error or change, a rezoning would be "affected by * * * error of law" or would be "arbitrary or capricious."

Although it has been said that the action of the District Council in rezoning in individual cases is ultimately legislative, it is clear that in performing this delegated and restricted function it acts largely as an administrative or adjudicatory agency. In *Board v. Levitt & Sons*, 235 Md. 151, 158, Judge Prescott, after noting that the General Assembly called the District Council of Prince George's County, acting in its function of rezoning, an agency, and referring to its *administrative* findings, in-

ferences, conclusions or *"decisions"* (emphasis added), said for the Court:

"We have repeatedly held that the action of zoning or reclassification of zoning is a function that is legislative in nature. However, this does not prevent the Council from making *administrative* findings of fact, drawing administrative inferences, and arriving at administrative conclusions and decisions, when hearing an application for rezoning, and the statute clearly anticipates such action. * * * After making its administrative findings of fact, etc., the Council is then in a position to exercise its legislative function of granting or denying the petition for reclassification."

In light of the administrative procedures and adjudications which the District Council is required to follow and make in the process of rezoning, the principles of public policy which underlie the rule of res judicata logically would seem to be applicable to its actions in this respect. See 2 Davis, *Administrative Law Treatise,* Ch. 18 (1958) ; 2 Cooper, *State Administrative Law,* Ch. XV, §§ 1 and 4 (1965) ; 2 Am. Jur. 2d *Administrative Law* §§ 496-97 (1962) ; Cohen, *Some Aspects of Maryland Administrative Law,* 24 Md. L. Rev. 1, 20 (1964) ; *Hollywood Circle v. Department of Alcoholic Bev. Con.* (Cal., In Bank), 361 P. 2d 712, 714; *Evans v. Monaghan* (N. Y.), 118 N. E. 2d 452, 458 ("Any general relaxation of the rule of *res judicata* is inadmissible even in strictly administrative matters").

Our predecessors took a contrary view. In *Knox v. City of Baltimore,* 180 Md. 88, they held that since the Board of Zoning Appeals was not a judicial tribunal its prior resolution that a property enjoyed a non-conforming use status at the time of the enactment of the zoning ordinance was not res judicata as to whether the lot owners held a non-conforming use at a later date. *Dal Maso v. County Commrs.,* 182 Md. 200, 205, held that all administrative boards and officials are legislative in character and "* * * are not judicial at all * * *" so that a rezoning of a particular lot was not res judicata as to its status and the District Council could later rescind its action and re-

fuse to rezone. Professor Davis, *op. cit. supra,* Ch. 18 (§§ 18.02, 18.03 and 18.08 in particular), finds it completely clear on principle that "* * * the reasons behind the doctrine of res judicata as developed in the court system are fully applicable to *some* administrative proceedings" and that "the courts generally follow this sound view * * *." He finds *Dal Maso* to have been based on a clear misunderstanding that an agency can never perform a function sufficiently judicial for the principles of res judicata to become applicable. Although he finds the result in *Dal Maso* to have been right on the theory there had been a change in conditions, Professor Davis says of the case in Sec. 18.08 of Volume 2 of his work on Administrative Law at pp. 601-02:

> "Worst of all is what the Maryland court has done —to lump together all agencies, to say that they are 'arms and instrumentalities of the Legislature and are not judicial at all,' and to conclude that therefore administrative action can never be res judicata. The unfortunate results of this type of thinking are rather clearly brought out in the Maryland zoning cases. * * * Happily, however, the Maryland court has seemingly retreated from its extreme position, for it has specifically acknowledged that 'innumerable controversies are decided today, by boards of legislative creation, of a character that traditionally fell within the scope of judicial inquiry.'" (citing *Hecht v. Crook,* 184 Md. 271, 277.)

See also *Schultze v. Montgomery Co. Bd.,* 230 Md. 76, in which we held that the Board, in determining compliance of a subdivision plan with the subdivision regulations in the Montgomery County Code, exercised a quasi-judicial function and could not disapprove a final plan after it had approved an identical plan, absent the development of new facts in the meantime, since this constituted a mere change of mind and was therefore arbitrary and capricious conduct. The Court said also that in prior cases such as *Mettee v. County Comm.,* 212 Md. 357, 365, and *Kay Const. Co. v. County Council,* 227 Md. 479, 486, 489, it had been held that in rezoning adjudications a mere

change of mind was insufficient to justify a reversal of previous action. *Kay* equated "good cause" in a statute authorizing the District Council to change a rezoning determination for good cause shown to (apart from fraud or surprise) " '* * * *a change in conditions or other considerations materially affecting the merits,* intervening since the former decisions,' " in adopting the language of *St. Patrick's Church Corporation v. Daniels* (Conn.), 154 Atl. 343 (at 345). It was held that the Council's claim of error of judgment "* * * was in reality a mere change of mind, a shift of majority opinion occasioned by the substitution of a councilman of one conviction for a councilman of another conviction," and that this was not a change in conditions constituting "good cause."

Whatever view may be taken of the applicability of the principles of the doctrine of res judicata to administrative or quasi-judicial determinations or actions of an agency, the text writers and the courts are in general agreement that the judgment or order of a court, including a trial court, which affirms or reverses such determinations or actions, ordinarily is. 2 Davis, *op. cit. supra* § 18.11, pp. 623-24; 2 Am. Jur. 2d *Administrative Law* § 499. See also annotation in 71 A. L. R. 2d 1362, "Judgment denying permit for use of premises under zoning regulations as bar to subsequent application." This Court has taken the position that in zoning cases principles of res judicata do apply, both where the first determination was as to an immutable fact or condition, *Baltimore v. Linthicum,* 170 Md. 245, and *Bensel v. City of Baltimore,* 203 Md. 506, and where changes were possible but had not occurred, *Whittle v. Bd. of Zoning Appeals,* 211 Md. 36. In *Whittle* the appeal was from an affirmance by the Circuit Court for Baltimore County of an order of the Board of Appeals granting a special permit in 1954 for a funeral home in a small residential area on York Road. Some five years earlier, in 1949, the Board had granted a similar permit but the Circuit Court had then reversed because of the residential character of the neighborhood. In affirming the grant of the second permit, Judge Barrett rejected the contention of res judicata because an additional filling station had been added to several in existence in the area in 1949 and a new record had been before the Board and was before him.

We reversed. Judge Brune, for the Court, noted that the *Linthicum* and *Bensel* cases dealt with unchangeable facts while the case then at hand required a determination of whether changes in circumstances which would warrant reconsideration had taken place. He pointed out (a) that the fact that the first judicial decision was by the Circuit Court and not an appellate court "* * * does not prevent the operation of the rule of *res judicata*" (p. 44); (b) that the decisive factor in this regard in Maryland under *Knox* (and *Dal Maso,* it may be added), on the one hand, and *Linthicum* and *Bensel,* on the other, is between a decision by a court of record and one by an agency of the Legislature; and (c) that provisions in a zoning ordinance setting a time after rejection of an application within which a new application may be filed do not dispense with the rule of res judicata. He then said at page 45:

> "The general rule, where the question has arisen, seems to be that after the lapse of such time as may be specified by the ordinance, a zoning appeals board may consider and act upon a new application for a special permit previously denied, but that it may properly grant such a permit only if there has been a substantial change in conditions. * * * This rule seems to rest not strictly on the doctrine of *res judicata,* but upon the proposition that it would be arbitrary for the board to arrive at opposite conclusions on substantially the same state of facts and the same law."

The changes in circumstances alleged to have occurred between 1949 and 1954 were then considered. These were: (1) increased commercialization of the area; (2) increased population of Baltimore County; (3) decreased opposition; (4) additional safeguarding conditions attached to the granting of the permit. There had been two changes in the immediate neighborhood—a stone church to replace a wooden one and a third filling station where there had been two, all some four hundred feet to the south on York Road. Considerable commercial development had come into being on York Road in the five intervening years, both north and south of the property, but none was shown to have had any effect "upon the residential char-

acter of the neighborhood where the protestants live" (p. 46). Of the new filling station we said:

"* * * one new filling station, some four hundred feet to the south on a busy highway, at or near an intersection already having two filling stations does not, in our judgment, show any substantial change or increase in commercialization between 1949 and 1954." (p. 46)

The increased population of Baltimore County and the need for new funeral homes to care for their needs had been testified to in the first case. On this point it was stated:

"In the second case, they offered testimony to show a further increase in population and hence a greater need for a new funeral home. Testimony on this phase of the case was more detailed in the second case than in the first, but the issue was the same and the testimony in the present case does not, in our estimation, show a materially different situation from that prevailing in 1949." (p. 46)

Neither neighborhood sentiment nor the slight distinction created by the additional restrictions were deemed to amount to a substantial change in circumstances. In conclusion we held:

"Because essentially the same facts appeared in the second case as appeared or as could have been shown in the first case, the appellees are barred by *res judicata*, and their petition should have been denied." (pp. 49-50)

We think *Whittle* is dispositive of the case before us. No substantial or significant change in fact or law was shown to have occurred between the 1961 application and its disposition in 1962, and that in 1963 and its disposition in 1964. The Board heard testimony as to, and Judge Parker considered as important in showing change between the two applications, four matters. The first was the proposed East-West Highway tentatively scheduled to run along one side of the property in question if and when built. That same road was alleged as a change

in 1961 and considered in the disposition of the first application, and it was as indefinite in becoming a reality in 1963 and 1964 as in 1961 and 1962, perhaps more so because by the time of the second application the Capital Beltway, which roughly parallels its tentative route, had been completed and was serving the needs and purposes the latter would have served. The second was the terrain and its relative suitability for single homes and apartment houses; this Judge Parker found had been considered in 1961-62 and obviously was unchanged. The third was the need for apartments—this was considered in 1961-62 and the lack of specific testimony in the record as to any greater need in 1963-64 than in 1961-62 and of land already zoned for apartment use and unavailed of, leads us to the view we held in *Whittle* as to the insubstantiality of the reliance on the population increase in Baltimore County between 1949 and 1954 and the alleged increased need for undertakers—"* * * the issue was the same and the testimony in the present case does not, in our estimation, show a materially different situation from that prevailing in * * * [1961-62]" (at p. 46 of 211 Md.). The fourth was eight changes in classification from R-55, the zoning of the subject property and the zoning which surrounds it for extended distances (except for the two nearby schools and a patch of R-35 zoning, both of which were in being in 1961-62) to R-18. It was not shown that these eight reclassifications were made after 1962 nor whether they were still on paper or actually had been made use of (except that some of them at least had not been developed), but what was much more important was shown, namely, that all of them were of pieces of land which were on the far side of wide, busy highways and a long distance from the subject property and the protesting neighbors. Three of these reclassifications involved small contiguous tracts about 4100 feet from the land involved here and across Route 450. Another is also across Route 450 some 6800 feet distant. Three others are from 6400 to 7200 feet away across Route 450, and the eighth is about 3300 feet away across Riverdale Road.

While what constitutes a neighborhood for the purpose of determining change under the law governing rezoning is not and should not be precisely and rigidly defined, but may vary from

case to case, we think that prima facie the properties just referred to which were reclassified from R-55 to R-18 should not be considered to be within the neighborhod of the subject property and the homes of the protestants, and the record offers no reason why this prima facie conclusion is not correct in this case or why the properties would, if developed in actual use under their new classifications, have any real effect upon or make any real change in the character of the neighborhood as one of individual family homes.

In *DuBay v. Crane,* 240 Md. 180, 185, 186, three protestants of a reclassification from one and two family use to garden apartments were held to live too far away to be aggrieved in that they could not show special effects or damage. One lived 1500 feet away across the Baltimore Beltway but, said the Court: "* * * his property is on the opposite side of the Beltway, which, if not a complete shield against the apartments to be constructed, will serve as an adequate barrier." Of the other two protestants we said: "* * * both reside a considerable distance (more than four-tenths of a mile) and possibly out of sight of the proposed apartments. And, * * * none * * * were able to show that the value of their respective property would be adversely affected." We think that if persons as close as 1500 feet across a superhighway and nine-tenths of a mile in one case and four-tenths in another were not within the neighborhood, so to speak, for the purpose of protesting rezoning changes, that without specific evidence of why the general rule should be different, reclassifications as far away as 3300 to 7200 feet and across major highways are not within the neighborhood and do not constitute changes therein. In *DePaul v. Board,* 237 Md. 221, 224, we said:

> "These changes have been numerous on both sides of Landover Road, and include reclassifications for apartments as well as commercial zones. None of these changes, however, is closer than approximately a half-mile to the property here involved, except for one lot which the aerial photographs show is undeveloped. The area immediately surrounding the appellant's property is zoned R-55 for single family homes."

See *Kaslow v. Rockville,* 236 Md. 159, 166 ("Important highways may serve to divide areas from each other for zoning purposes; *Hewitt v. Baltimore County,* 220 Md. 48, 60, 151 A. 2d 144; *Shadynook Imp. Assn. v. Molloy,* 232 Md. 265, 272, 192 A. 2d 502"). In *Stocksdale v. Barnard,* 239 Md. 541, 548, this idea was restated:

"He [the trial judge] based his decision on the fact that several zoning changes had been granted in the area. But, an examination of the record shows that all except one of these changes were on the opposite, west side of York Road from applicants' property. We have held in past cases that a street or road may be a natural boundary line between two zones. *Sapero v. M. & C. C.,* 235 Md. 1, 200 A. 2d 74. In *Shadynook Imp. Assn. v. Molloy,* 232 Md. 265, 192 A. 2d 502, we held that the existence of apartment uses on one side of the street does not alter the use of the land on the opposite side, and therefore the street is an appropriate line of demarcation."

Finally, the Council heard testimony as to, and Judge Parker considered, the rezoning of a shopping center area beyond the school site from the instant property from C-1 to C-2 and the rezoning to commercial of two small roadside areas along Annapolis Road. The shopping center area had been rezoned to C-1 and was under construction when the first application was filed (it seemingly had been finished before the Circuit Court decision in 1962) and the change from C-1 to C-2 (to permit an automobile showroom, it was suggested at the argument) would not seem to have changed the character of the neighborhood between 1961-62 and 1963-64 anymore than the added filling station and the more distant increased commercialization in *Whittle.* One of the two small areas rezoned C-2 is at one end and the other at the other end of a small strip of land which was zoned and used as C-2 before the first application. The rationale of *Whittle* to the small extension of existing commercialization there applies to these rezonings here.

The appellees argue that the law has been altered since 1961-

62 in that the definition of an R-18 zone was changed there-
after and before 1964 so as to make the R-18 zone in Prince
George's County analogous to the R-H ("floating") zone con-
sidered in *Beall v. Montgomery County*, 240 Md. 77. The point
was not raised before or considered by either the District Coun-
cil or the Circuit Court. The new definition was not formally
put before us but the appellees concede that it is like the former
one except that the density in an R-18 zone is decreased slightly
—under the former density limitations perhaps 950 apartments
could have been built on the subject tract in contrast to from
800 to 850 under the new. We think this is not such change in
the law as would dispense with principles of the doctrine of
res judicata. R-18 zoning permitted garden apartments in 1961-
62 and it permitted them in 1963-64. Earlier there could have
been built on the forty-seven acres here being dealt with ap-
proximately four and three-quarter times as many apartment
living units as individual homes, later perhaps four and one-
quarter, a difference not in kind and, we believe, not legally
significant in degree.

The Council erred in granting rezoning without considering
change between its first and second considerations of the mat-
ter, and would have erred if it had undertaken such considera-
tion and granted rezoning on the testimony before it, since on
that testimony substantial or significant change could not rea-
sonably have been found by reasoning minds to have occurred,
and the order of the Circuit Court affirming the Board must
be reversed.

*Order reversed, with costs.*

BARNES, J., filed the following dissenting opinion.

I dissent for three reasons: 1) because of the unduly re-
strictive nature of the Maryland "mistake-change in conditions"
rule, 2) because the doctrine of *res judicata* is, in my opinion
not applicable, and 3) because, in my opinion, there were suf-
ficient changes in conditions between October 1961 and the time
of the change of zone to make that rezoning change "fairly de-
batable" even if the "mistake-change" rule in its present vigor
and the doctrine of *res judicata* were applicable.

## I.

I pointed out at some length in Part III of my dissenting opinion in *MacDonald v. Board of County Commissioners for Prince George's County*, 238 Md. 549, 576-601, 210 A. 2d 325, 340-354 (1965) why I thought the Maryland "mistake-change in conditions" rule in regard to rezoning improperly came into the Maryland law. I also pointed out that it has been repudiated by the courts of last resort in many of our sister States and has suffered severe criticism by text writers on zoning. I also sought to indicate why the "mistake-change" rule was contrary to the public interest and as a purely judge-made rule we might change—or at least modify—it thereby freeing the people's representatives who "would arise from the present Procrustean bed upon which we have placed them, with renewed vigor to advance the public interest." [1]

The majority opinion in the case at bar not only forces the legislative body upon the Procrustean bed, but adds several new slats to that bed, makes it shorter and more narrow and, to me, makes it far more uncomfortable than even it was before. The majority opinion adds further rigidity to the "mistake-change" rule by indicating that this rule has been incorporated by implication into the provisions of the Act of 1959, ch. 780, amending sections of the Code of Public Local Laws of Prince George's County (1953 Edition), and particularly Section 79(i) indicating the grounds on which the trial court can reverse or modify the action of the District Council. As I read the Section 79(i), the reasons set forth, except possibly subsection (6) which may well be unconstitutional,[2] they merely state those elements which would make the action of the District Council unreasonable, arbitrary or capricious or would result in a taking of private property without the payment of just compensation. We have held that the true test of the va-

1. MacDonald, supra, at page 582 of 238 Md.; page 344 of 210 A. 2d.

2. We have heretofore declined to pass upon this issue. See Sampson Brothers (Md.) Inc. v. Board of County Commissioners of Prince George's County, 240 Md. 116, 120, 213 A. 2d 289; 292 (1965) and the prior cases cited in Note 1 of the opinion in that case. Fortunately subsection (6) was eliminated from Section 79(i) by the Acts of 1965, ch. 898, effective June 1, 1965.

lidity, *vel non,* of legislative action in rezoning is whether that action is unreasonable, arbitrary and capricious *Sampson Brothers (Md.) Inc. v. Board of County Commissioners of Prince George's County,* 240 Md. 116, 213 A. 2d 289 (1965) and prior cases cited therein, or results in an unconstitutional taking for public use without the payment of just compensation. *Frankel v. City of Baltimore,* 223 Md. 97, 103, 162 A. 2d 447, 451 (1960) and prior cases cited therein. I cannot see how these provisions accomplish any more than they state; if the General Assembly had desired to incorporate the "mistake-change" rule, as a further limitation on the exercise of the delegated legislative power, it doubtless could have found language to express that desire. In the absence of such language, I think the General Assembly only intended to accomplish what it expressed and to adhere to the rule that legislative acts will only be declared unconstitutional or invalid by the Courts when clearly unreasonable, arbitrary or capricious, or when they result in an unconstitutional taking of private property for public use without the payment of just compensation.

Further rigidity to the "mistake-change" rule is added by the vigorous application of the doctrine of *res judicata* to rezoning cases. My reasons for the inapplicability of this doctrine in rezoning cases will be considered later in this dissenting opinion.

The majority opinion to my mind indicates again the need for a reconsideration of the "mistake-change" rule and confirms the reasons for such a reconsideration set out in my dissent in *MacDonald.*

## II.

The majority opinion recognizes that if rezoning is legislative in character, the doctrine of *res judicata*—a doctrine applicable only to final adjudication by *judicial* bodies—cannot apply. The majority opinion recognizes "that the action of the District Council in rezoning in individual cases is ultimately legislative". In other words, it begins as a legislative action and it ends as a legislative action. However, somewhere between the beginning of the action and its end result, the majority indicates that it takes on a judicial character and the doctrine of *res judicata* applies. In my opinion this concept is unsound. As I stated in the dissenting opinion in *MacDonald:*

"Another reason for upholding the action of the legislative body here is that it is a *legislative body,* and not a mere administrative organ. Zoning and rezoning is legislative in character; it is not quasi-judicial, administrative, quasi-legislative, quasi-executive, or anything other than legislative. Rathkopf, *The Law of Zoning & Planning* (3d ed.), Section 27; Yokley, *Zoning Law & Practice* (2d ed.), Section 83, and cases collected therein; 101 C.J.S. *Zoning,* Section 1 and cases cited." [3]

There is no doubt that the General Assembly in delegating the zoning power to the local legislative body may restrict the exercise of that power in any reasonable and constitutional way, including limitations or restrictions usually associated with judicial proceedings. But such limitations and restrictions do not, in my opinion, convert what is essentially a legislative function to a judicial function carrying with it the more restrictive requirements of due process of law ordinarily associated with judicial proceedings. Indeed it is constitutionally impossible in Maryland to effectuate a conversion of a legislative function to a judicial function as the judicial power is exclusively vested by Article IV of the Maryland Constitution in the Courts mentioned in that Article and this judicial power may not be delegated to either executive or legislative boards or commissions. Our predecessors specifically held this in *Dal Maso v. Board of County Commissioners of Prince George's County,* 182 Md. 200, 34 A. 2d 464 (1943). This case, like the case at bar, arose in Prince George's County and also involved a rezoning situation. In *Dal Maso,* the Board of County Commissioners for Prince George's County acting as the District Council after giving the notice and conducting the hearing required by the Act of 1939, Chapter 714, rezoned the Dal Maso property at Riverdale from Residential "A" to Commercial "D" on July 7, 1942. A week later, on July 14, 1942, the District Council rescinded its order of July 7 and gave notice of a new hearing to be held on August 18, 1942. Before the day of the new hearing arrived, however, the property owners on August 12, 1942 filed a pe-

3. Page 586 of 238 Md., page 346 of 210 A. 2d.

tition for a writ of mandamus [4] in the Circuit Court for Prince George's County to compel the District Council to reinstate and abide by its resolution of July 7 which it had rescinded on July 14. In the petition for the issuance of the writ of mandamus the petitioners alleged that the Board's action of July 14 "was arbitrary, without legal sanction and in violation and deprivation of the rights of the petitioners in the use of their property and beyond the powers of said Board and void." Judge Ogle Marbury, an Associate Judge of the Court of Appeals (and later Chief Judge) and Chief Judge of the Seventh Judicial Circuit, heard the case in the trial court, held the petition insufficient on demurrer and dismissed the petition. This order was affirmed by the Court of Appeals by a unanimous Court. The opinion for the Court of Appeals was written by Chief Judge Sloan who, in regard to the contention of the petitioners that the Board's action of July 7 was *res judicata* stated for the Court:

> "The petitioners contend that the order of the defendant amending the zoning regulations is *res judicata,* which means, of course, that it has the permanence of a judgment or decree of a court of competent jurisdiction. There is some confusion as to the nature and character of these administrative boards, and there are many opinions and text writers who refer to them as quasi-judicial. They do hear facts and, based on them, make decisions, but those decisions are not judgments or decrees. If their findings, resolutions, or orders are resisted or ignored, they must call on the courts to enforce them. Administrative boards and of-

---

4. By the Act of 1939, Chapter 714, Secs. 17, 19 the restrictions placed upon the power of the District Council to rezone were a requirement for submission of the proposed amendment and any accompanying map to the Maryland-National Capital Park and Planning Commission for consideration and report for a prior period not less than 30 days, and for a hearing, for which 30 days prior notice was required to be given in two newspapers of general circulation in the county in which the land was located. There was no provision for any appeal to the Circuit Court for Prince George's County or to the Court of Appeals.

ficials are arms and instrumentalities of the Legislature, and are not judicial at all; they belong to and derive all their authority from the legislative branch under our form of government. In this State, all judicial authority is only such as is provided for by Article 4 of the Maryland Constitution, and it has been decided that only judicial functions can be exercised which find their authority in that Article (*Day v. Sheriff,* 162 Md. 221, 159 A. 602; *Humphreys v. Walls,* 169 Md. 292, 181 A. 735; *Quenstedt v. Wilson,* 173 Md. 11, 194 A. 354; *Levin v. Hewes,* 118 Md. 624, 86 A. 233), and that no court not coming within its provisions can be established in this State. This forbids any power in the Legislature to clothe administrative boards with any judicial authority. There may be states in which it can be done, but Maryland is not one of them." (Page 205 of 182 Md.; page 466 of 34 A. 2d).

In 1962, Judge Prescott, speaking for the majority of the Court in *Maryland Committee for Fair Representation v. Tawes,* 228 Md. 412, 425-426, 180 A. 2d 656, 663, stated:

"Section 1 of Article IV of the Maryland Constitution vests the judicial power of the State in the Judiciary, and this encompasses *all* the judicial power of the State. *Magruder v. Swann,* 25 Md. 173." (The emphasis is in the original quotation).

The petitioners in *Dal Maso* had relied heavily on the decision of the Court in *Board of Zoning Appeals v. McKinney,* 174 Md. 551, 199 Atl. 540 (1938). As to this case it was stated:

"The powers conferred by the Legislature are powers which belong to it, and which the public necessity and convenience require to be administered by its creatures. As was said in the McKinney case, 174 Md. 560, 199 A. 544: 'The Board is a type of those administrative agencies which necessarily play so large a part in the operation of government under modern

conditions, the function of which is to ascertain and determine ultimate facts upon which the legislative will is to operate. Such a function involves the exercise of discretion, and judgment, and is in its nature judicial.' This might have been qualified by adding, so long as it does not conflict with or impinge on Article 4 of the Maryland Constitution. Their function and sphere of action as defined by Judge Miller of Iowa in a brochure on Administrative Law of the American Bar Association is: 'The inquiry is not for the purpose of determining existing facts and resultant and controverted rights and duties, which is a judicial function, but is for the formation and determination of future rights and duties, which is a legislative function.' If there is no remedy provided, the usual methods of mandamus to compel action or injunction to prevent it are available." (Pages 205-206 of 182 Md.; pages 466-467 of 34 A. 2d).

The Court in *Dal Maso* cited with approval its decision in *Knox v. Baltimore*, 180 Md. 88, 23 A. 2d 15 (1941) and stated:

"The most recent case in this court as to whether a zoning order, permit, or resolution is *res judicata* is *Knox v. Baltimore*, 180 Md. 88, 23 A. 2d 15, where the appellant contended that the Board of Zoning Appeals could not revoke a prior resolution or classification of his property. It was there said (page 93 of 180 Md., page 17 of 23 A. 2d) : 'The Board of Zoning Appeals not being a court of competent jurisdiction or judicial tribunal it cannot be held that the resolution passed by that Board on February 28, 1939, was *res judicata* as to whether appellant had a non-conforming use in the lot in question.' " (Page 207 of 182 Md.; page 467 of 34 A. 2d).

As the majority opinion points out, Professor Davis in his work on *Administrative Law* is critical of *Dal Maso*, but it has never been overruled by the Court of Appeals and the majority does not purport to overrule it. On the contrary, it has been

cited many times by the Court. As I see it, our obligation is to follow *Dal Maso* rather than Professor Davis.

In *Schultze v. Montgomery County Planning Board*, 230 Md. 76, 79, 185 A. 2d 502 (1962) and in *Kay Construction Co. v. County Council for Montgomery County*, 227 Md. 479, 486, 177 A. 2d 694 (1962), both cited in the majority opinion, there is *dicta* which indicates that the County Council in Montgomery County does exercise "quasi-judicial functions." In my opinion, this is unfortunate language, unnecessary to the decisions in those cases, which gives rise to the notion that the holding in *Dal Maso* has been somewhat impaired but not overruled. As I see it, in both cases the County Council was exercising a *"restricted legislative function,"* not a *"quasi-judicial function."* It has been my observation that when the prefix "quasi" is appended to a well-defined word, distinctions are blurred, fuzzy thinking is invited and error often results. Its use should be avoided. If the restrictions placed upon the exercise of legislative power are those usually associated with the exercise of judicial functions, one may inquire if the characterization of the function as "quasi-judicial" really does any harm and if the suggested difference in characterization is not merely a semantic exercise? I think not. These are quite different concepts and result in different applications of the requirements of due process of law, depending upon whether a function is "legislative," on the one hand, or "judicial" on the other. If the function is legislative, due process of law does not require a hearing, the opportunity for counsel, the taking of testimony (under oath or otherwise), the right of confrontation or cross-examination and other time-honored safe guards associated with the exercise of a judicial function. The only limitations upon the exercise of the legislative power are those specifically set forth in the Constitution, as for example, the prohibition against the taking of private property other than for public use and upon the payment of just compensation, and that the legislation be not unreasonable, arbitrary and capricious and *thus* a denial of due process of law. When the legislative power is delegated by the General Assembly to a local legislative body the grant is unlimited, except as limited by the statute making the grant of legislative power, subject, of course, to the con-

stitutional limitations mentioned. In short, the power of review of a court, either upon an original proceeding or upon appeal, is limited to the constitutional limitations mentioned *and* such limitations as the statute imposes. In my opinion, the factors set forth in Section 79(i) which justify reversal or modification by the Court are all (except "(6)" already mentioned) in effect those factors which present the specific constitutional limitations or the issue of whether the action is unreasonable, arbitrary or capricious. They are adapted from Sec. 255(g) of Article 41 of the Maryland Code, a section of the Administrative Procedure Act which by its definition is inapplicable to an "agency" in the "legislative or judicial branches." [5] It seems clear that the other provisions of the Administrative Procedure Act are *not* made applicable to proceedings before the District Council as a result of the rule of construction, *inclusio unius est exclusio alterius."* See *Gay Investment Company v. Comi,* 230 Md. 433, 438, 187 A. 2d 463, 466 (1963).

It seems clear to me that in conducting a hearing on a rezoning application the District Council is not required to permit cross-examination or even to swear the witnesses, which would be required if the proceeding were a judicial function, or if the provisions of the Administrative Procedure Act were applicable to the District Council.

In *Schultze v. Montgomery County Planning Board, supra,* the Montgomery County Planning Board in the absence of fraud, surprise, mistake or inadvertence and any additional facts had "a mere change of mind" in its approval of a final subdivision plan as complying with the provisions of the Montgomery County Code and attempted to disapprove it. The property owner filed a bill in equity to have the Circuit Court for Montgomery County declare that this action by the Planning Board was arbitrary and capricious. The trial court dismissed the bill of complaint, but the decree was reversed on appeal. The Court of Appeals held that this mere change of mind was arbitrary and capricious conduct. This holding is entirely consistent with the exercise of a function legislative in nature. Indeed there was no thought that the original action of the Plan-

---

5. Md. Code (1957), Art. 41, Sec. 244(a).

ning Board was *res judicata* and this doctrine is not mentioned in the opinion of the Court.

In *Kay Construction Co. v. County Council for Montgomery County, supra,* the County Council *rezoned* a tract of land in Wheaton from the R-60 Zone (single-family dwelling) to the R-20 Zone (medium density, multi-family) or R-30 Zone (low density, multi-family) in November 1959 by a four to three vote. After petitions were filed for reconsideration by residents in the area and a citizens' association, the County Council, on March 1, 1960, after there had been a replacement of a former member of the Council, by a four-three vote granted reconsideration and recited that it "finds for good cause shown that its decision should be reconsidered." This "finding" was made in an attempt to comply with § 104-42 of the Montgomery County Code (1960 Ed.) which required that "good cause" be shown if the Council granted reconsideration of an amendment to the map or text of the zoning ordinance. A rehearing was held on March 22, 1960 and on April 12, 1960 the County Council by the same four-three vote rescinded the original rezoning resolution. There were no changes occurring between the original approval and the subsequent denial of the rezoning resolution. The trial court sustained the reconsideration and denial. Its order was reversed on appeal. The Court of Appeals held that the Council's subsequent action was a "mere change of mind" and this was not *good cause* for reconsideration of the original action of the Council. In other words, the holding by the Court was predicated upon the legislative restriction requiring that good cause be shown. Judge Sybert, speaking for the Court stated at page 486 of 227 Md.; page 698 of 177 A. 2d:

> "We recognize that the cases cited dealt with zoning boards exercising quasi-judicial powers, while, as we have indicated, *the instant case involves the Council acting as a legislative body.* However, the reasoning applied in those cases has some relevance to the issue before us. The Ordinance, by requiring that 'good cause' be shown as a necessary condition to the granting by the Council of a petition for reconsideration, has in effect *grafted upon that agency a limitation which exists in regard to quasi-judicial bodies even*

*in the absence of statute.* It permits the Council to grant a petition for reconsideration only where there appears to be a substantial reason for doing so, as defined in the cases cited." (Emphasis supplied).

The Court recognizes that the County Council was acting in a legislative capacity in granting the rezoning application and that the applicable limitation is legislatively, and not constitutionally, imposed. Again there was no reliance upon the doctrine of *res judicata;* the doctrine is not mentioned. The Court most certainly recognized that rezoning is a legislative function and was not a so-called "quasi-judicial" function.

It seems clear from our prior decisions that the doctrine of *res judicata* does not apply to any zoning decisions by Boards of Zoning Appeals. As Chief Judge Brune, for the Court, stated in *Whittle v. Board of Zoning Appeals of Baltimore County,* 211 Md. 36, 44, 125 A. 2d 41, 45 (1956) :

> "\* \* \* [T]he doctrine of *res judicata* has been held not to be applicable where the earlier decision was made not by a court of record, but by a board of zoning appeals, an administrative agency. *Knox v. Mayor & City Council of Baltimore,* 180 Md. 88, 23 A. 2d 15."

When a case reaches the trial court level, however, in a case involving the *application of the zoning ordinance to a specific property owner in a contested matter,* the principles of *res judicata* may then apply. This is because there is a contested case before *a court* exercising a *judicial* function. The doctrine has been applied in cases involving a judicial determination that a post office use was a business use not permitted in a residential use district, *Baltimore v. Linthicum,* 170 Md. 245, 183 Atl. 531 (1936), that the use in question was not a non-conforming use, *Bensel v. Baltimore,* 203 Md. 506, 101 A. 2d 826 (1954) and that no special exception should be granted for a funeral home in a residential use district, *Whittle v. Board of Zoning Appeals of Baltimore County, supra.* In these cases, it is pointed out that the estoppel by judgment is not a *direct estoppel* but is a *collateral estoppel of an adjudicated fact by judgment,* so that if there is a change in the factual situation between the

time of the original adjudication and the subsequent application, there is no effective estoppel by the prior judgment. *Whittle, supra,* at page 45 of 211 Md.; page 46 of 125 A. 2d.

The majority indicates that the decision in *Whittle* is dispositive of the case at bar. I cannot agree. *Whittle* dealt with a special use exception for a funeral home in a residential use district, and not with a change in the zoning law itself by the legislative body as is the situation in the case at bar. In the one case the law is not amended; in the other case, the law is amended. In the one case there is a definite issue of fact to be determined; in the other case, the question is whether or not the change in the zoning map is "fairly debatable." The determination of this latter question means that on the facts then before the legislative body, the issue could have been decided *either way.*

Neither *Linthicum, Bensel* nor *Whittle,* involved a change in the zoning law, and there is no case in Maryland prior to the decision by the majority in the case at bar that applies the doctrine of *res judicata* in a rezoning case. In my opinion, it is an unwarranted restriction upon the legislative power. Indeed, upon the limited appeal provided by statute, *the Court makes no determination of any facts*—there is no testimony taken before the Court—as the entire determination is essentially limited to two issues 1) was the District Council's action "fairly debatable" or 2) did it result in a taking of property without just compensation. When the District Council *removes* zoning restrictions from the rezoned property obviously consideration No. 2 does not apply. In regard to the determination that the issue was "fairly debatable",[6] it would seem to me that the same facts would also be "fairly debatable" at the time of a second consideration of those facts by the District Council. If the

---

6. Judge Loveless in his opinion affirming the former action of the District Council in declining to change the zone stated: "However, even though there is much indication in this record that an effort was made to sway the Commissioners by petitions and a large turnout of opponents, there still exists facts presented of a substantial nature that makes the question reasonably debatable *and a ruling either way would not have been arbitrary, capricious or unsupported by competent, material and substantial evidence."* (Emphasis supplied).

different action on those same facts resulted from a new zoning viewpoint, a new evaluation of those same facts, in short, for any reason not motivated by fraud, a "plebiscite of the neighbors" or other impermissible consideration which would render the action unreasonable, arbitrary or capricious, I can see no legal or constitutional reason why the District Council, as a legislative body, could not come to a different conclusion. I would so hold.

The mandate of Article 8 of the Declaration of Rights in the Maryland Constitution must always be kept in mind. It provides:

> "That the Legislative, Executive and Judicial powers of Government ought to be forever separate and distinct from each other; and no person exercising the functions of one of said Departments shall assume or discharge the duties of any other."

## III.

But even if the "mistake-change" rule be vigorously applied and if the doctrine of *res judicata* should be deemed to be applicable, it appears to me that there were sufficient changes in conditions in the neighborhood between October 1961 and the time of the change in zone to make the rezoning change "fairly debatable."

## (A)

Since October 1961, there has been a change in the zoning law itself in regard to the R-18 zone—the very zone involved in the case at bar—*reducing the density* in that zone. It would be difficult to think of a more substantial "change in conditions" than an amendment to the zoning law itself to reduce the density in the very zone in question.

The majority indicates that the change in density was not substantial as "under the former density limitations perhaps 950 apartments could have been built on the subject tract in contrast to 800 to 850 under the new." To my mind this is a substantial difference which would support the District Council in its rezoning action.

## (B)

There was also a subsequent change in the zoning of the commercial property on which a shopping center has been erected lying approximately 700 feet to the southeast of subject property.[7] The zoning change was from C-1 (local commercial) to C-2 (general commercial). There can be no doubt that this commercial property is "within the neighborhood" of the subject property. The majority suggests that this change for more intensive commercial use was "to permit an automobile showroom" as "was suggested at the argument" and this use "would not seem to have changed the character of the neighborhood between 1961-62 and 1963-64 any more than the added filling station and the more distant [uses?] increased commercialization in *Whittle* * * *." The reliance on the *Whittle* case appears to be misplaced. The opinion in that case points out that at the time of the original case there were already two filling stations in the area when the third one was added, so that it is apparent that there was no change in the zoning ordinance to permit a more extended commercial use subsequent to the original action. The District Council was entitled to consider the quite *different character* of the uses permitted by the C-2 classification, rather than the one particular increased use to which the C-2 property apparently had been immediately put.[8]

## (C)

In my opinion the District Council was entitled to consider as a change in conditions which would indeed change the character of the neighborhood, the extension of the proposed East-West Highway immediately adjoining the subject property on the northeast. In the Report of the Technical Staff of March 18, 1964, it was stated:

> "The proposed right-of-way for the extension of the East-West Highway forms the northeastern boundary of the tract."

---

7. In the majority opinion it is indicated that the shopping center is 1500 feet from the subject tract. In the Technical Staff's Report in 1961, however, the following is stated: "Located approximately 700 feet to the southeast of the subject property is a tract of land zoned C-1 which is the site of the Glenridge Shopping Center presently under construction."

8. An examination of the Prince George's County Code will

Although this extension of the East-West Highway was mentioned in both the Report of the Technical Staff and in Judge Loveless' opinion in 1961, the completion of that extension was nearer to fruition at the time of the approval of the rezoning than it was in 1961. In fact, the uncontradicted evidence of Fred W. Tuemmler, a well qualified planning consultant, indicated that the *reservations* for the proposed East-West Highway *had been obtained* in areas adjacent to the subject property. He also testified that this extension "is number one on the County Commissioners' list of improvements" and that with "the very effective presentation that they usually make before the State Roads Commission, it won't be long before you have that East-

---

disclose that the difference between the permitted uses in a C-1 zone and those is a C-2 zone is great indeed.

| Typical Uses Permitted in the C-1 Zone | Typical Uses Permitted in the C-2 Zone |
|---|---|
| (Local Commercial) | (General Commercial) |
| Retail business (trade, business, professional, supplying the normal needs of a local community) such as the following: | Automobile parking lot<br>Carpet and rug shampooing<br>Dry cleaning store-plant<br>Hotel<br>Motel |
| Bakery | * * * |
| Bank | Tinsmith and roofing service |
| Barber shops | |
| Beauty shops | |
| Business offices | |
| * * * | |
| Gift shops | |
| * * * | |
| Ice Vending machines | |
| * * * | |
| Market | |
| Physicians, dentists and other professional offices | |
| * * * | |
| Shoe repair shop | |
| * * * | |
| Tailor | |
| Telegraph and message service | |
| * * * | |

West Highway as a reality. It is needed, and they will meet the need."

We held in *Rohde v. County Board of Appeals for Baltimore County*, 234 Md. 259, 199 A. 2d 216 (1964) that the proposed extension of a road could properly be considered as a "change in conditions" for a reclassification. Chief Judge Brune, for the Court, stated:

> "There was testimony that the State Roads Commission was willing to build the proposed extension of Goucher Boulevard, if duly requested by the County to do so, and that the County would make such a formal request in writing. Though there was some question as to just how soon the Commission could or would act, we think that the evidence was sufficient to show that this extension was 'reasonably probable of fruition in the foreseeable future.' The Board was, accordingly entitled to consider it in determining the proper classification of the subject property. *Trustees of McDonogh Educational Fund and Institute v. Baltimore County*, 221 Md. 550, 570-71, 158 A. 2d 637." (Page 264 of 234 Md.; pages 218-219 of 199 A. 2d).

See also *Jobar Corp. v. Rodgers Forge Community Ass'n.*, 236 Md. 106, 112, 202 A. 2d 612, 615 (1964). Cf. *McBee v. Baltimore County*, 221 Md. 312, 317, 157 A. 2d 258, 261 (1960).

The testimony in the case at bar establishes to my mind that the extension of the East-West Highway was "reasonably probable of fruition in the foreseeable future" and was properly considered as a change in conditions. This extension of that large controlled-access road will greatly alter the character of the neighborhood and will erect a barrier between the subject property and the land lying to the east of that highway. The Prince George's County Planning Board in recommending approval of the R-18 zone for the subject property gave this proposed extension consideration. James M. Hennessey in presenting the Planning Board's favorable recommendation, stated:

> "It is the Board's considered opinion that the reclassification of the property to the R-18 Zone would provide for a more orderly development of the area,

since the property is adjacent to semi-detached homes.

"Furthermore, the proposed East-West Highway forms a natural barrier between this property and adjoining property to the East, and between the property and East Pines is all undeveloped, so that this petition would assist in the orderly development of the Community."

Cf. *Lutherville Community Ass'n v. Wingard,* 239 Md. 163, 210 A. 2d 534 (1965).

(D)

I am also of the opinion that the District Council could properly consider the substantially increased need for the R-18 type of apartments in an area close to the nation's capitol and in a county which the uncontradicted evidence established "as the fastest growing county in the Country." In 1960 the population of Prince George's County was approximately 357,000. By the Planning Commission's estimates there were at the time of the hearing in the case at bar 423,000 people in the County—a gain of 18%. The estimates indicated a population of 790,000 by 1980 or more than a 100% increase in the 20 years from 1960. It is apparent that in such a volatile situation, the need for the type of apartments permitted in the R-18 zone has substantially increased since 1961 or 1962 and the testimony indicated this. The factual situation in this case is quite different from that in the *Whittle* case, relied upon by the majority, as in the *Whittle* case it was pointed out in the opinion there was not "a materially different situation from that prevailing" at the time of the prior decision. The evidence indicates to me that the situation *is* materially different in the case at bar at the time of the change in zoning than it was at the time of the prior decision.

We must not permit zoning to become static. As Judge Prescott, for the Court, aptly said in *Missouri Realty v. Ramer,* 216 Md., 442, 447, 140 A. 2d 655, 657 (1958) :

"It is a principle of universal recognition that zoning, once imposed, is not static. If it could not be altered with the changing conditions that surround us in the world today, progress would be retarded, and

many of the advantages, logically expected from zoning, would be lost."

See also *Rohde v. County Board of Appeals for Baltimore County, supra,* at page 267 of 234 Md., page 220 of 199 A. 2d; *Offutt v. Board of Zoning Appeals of Baltimore County,* 204 Md. 551, 557, 105 A. 2d 219, 222 (1954).

The Planning Board and the District Council thought that the change in zone was justified by the changes in conditions. Judge Parker thought the issue was fairly debatable, and so do I.

For all of the reasons stated, I would affirm Judge Parker's order.